2014 VT 99

## Ute Regan v. Antonio B. Pomerleau, DeForest Realty, Inc. and City of Burlington

## In re Regan Subdivision Permit (DeForest Realty, Inc. and Friends of Chittenden Drive, Appellants)

[107 A.3d 327]

Nos. 13-101 & 13-281

Present: Reiber, C.J., Skoglund and Robinson, JJ., and Teachout and Eaton, Supr. JJ., Specially Assigned

Opinion Filed August 14, 2014

*Liam L. Murphy* and *Damien J. Leonard* of *Murphy Sullivan Kronk*, Burlington, for Plaintiff-Appellee (13-101) and Appellee (13-281) Regan.

*Daniel P. O'Rourke* and *Adam P. Bergeron* of *Bergeron, Paradis & Fitzpatrick, LLP*, Burlington, for Defendant-Appellant (13-101) and Appellant (13-281) DeForest Realty, Inc.

*Claudine C. Safar* and *Courtney E. Butler* of *Monaghan Safar Ducham PLLC*, Burlington, for Appellant Friends of Chittenden Drive (13-281).

*Kimberlee J. Sturtevant*, Assistant City Attorney, Burlington, for Amicus Curiae City of Burlington (13-281).

¶ 1. **Skoglund, J.** In these consolidated appeals we review rulings by the environmental and civil divisions concerning a subdivision application for a property located within a residential development in the City of Burlington. Appellants' principal contention is that the courts erred in concluding that the subdivision had the requisite access to a public road. We affirm the judgments.

¶ 2. The background to these appeals may be briefly summarized; additional material facts will be set forth in the discussion which follows. Ute Regan (applicant) owns a lot and single-family dwelling in a residential subdivision in Burlington known as the Overlake Park Development. The subdivision was created in 1955 by the Overlake Park Development Corporation, which built several streets within the development. One of these, Chittenden Drive, was laid out along a fifty-foot wide strip. Overlake paved a thirty-foot wide portion of the street and retained ten feet of "greenspace" on either side.

¶ 3. In 1961, Overlake sold the development to DeForest Realty, Inc. The deed to DeForest contained a covenant restricting the use of each lot within the subdivision to "one dwelling for a single family dwelling unit." By its terms, the covenant expired in 1995. In 1965, DeForest sold Lot 76, which fronts on Chittenden Drive, to applicant's predecessor-in-interest. Consistent with the other deeded lots, the deed to Lot 76 placed the boundary ten feet from the curb of Chittenden Drive, and stated that the lot was subject to the covenants more particularly set forth in in the 1961 deed from Overlake to DeForest Realty. A single-family home was built

on the property in the 1960s. Applicant purchased the home and lot in 1987.

¶ 4. In April 2010, applicant submitted an application to the City's Department of Planning and Zoning for a permit to establish an accessory apartment in her single-family home. The Department granted the permit, prompting an administrative appeal by Friends of Chittenden Drive (Friends), a group comprised of other residents on the street. In June 2010, following a hearing, the Development Review Board (DRB) approved the permit, and Friends appealed to the environmental court.

¶ 5. Applicant had also sought a permit to subdivide her property into two lots, one containing the existing single-family home and the other vacant. The subdivision plan provided that each lot would contain at least sixty feet of road frontage, as required by the City's Comprehensive Development Ordinance (CDO). CDO § 4.4.5-1. In reviewing the application, however, the DRB noted that "a 10 foot wide strip of privately owned land runs between the subject lot and Chittenden Drive (a private street)." Thus, while the DRB ultimately granted the permit, it conditioned approval on applicant's demonstrating "that the proposed vacant lot has the required access (via easement or otherwise) to the adjacent street (Chittenden Drive)." DeForest Realty appealed the DRB's decision to the environmental court, and Friends and applicant submitted separate appeals.[1]

¶ 6. In September 2010, the parties agreed to place the environmental-court appeals on inactive status pending the outcome of a contemplated quiet-title action by applicant in the civil division to determine her right to access Chittenden Drive from the vacant lot. Applicant filed her quiet-title action in January 2011, naming DeForest Realty and its principal owner Antonio B. Pomerleau as defendants. Applicant claimed that she was entitled to access Chittenden Drive under a number of theories, including adverse possession of the disputed ten-foot strip, implied easement, and easement by necessity. In a written ruling issued in October 2011, the trial court granted applicant's motion for summary judgment, concluding that she had acquired an implied easement of access over the ten-foot greenbelt strip "by reference" to the recorded plat map. The court also concluded that,

---

[1] Applicant's sole question on appeal to the environmental court was whether the condition requiring that it demonstrate access to Chittenden Drive was proper.

inasmuch as the restrictive covenant had expired in 1995, the implied easement allowed access from the additional vacant lot. DeForest filed a timely appeal of the ruling with this Court.

¶ 7. The parties then moved to reactivate the pending appeals in the environmental division, which the court granted, and the matters proceeded to decision. In mid-December 2012, the trial court granted applicant's motion for summary judgment in the accessory-dwelling appeal, and entered judgment in her favor. Shortly thereafter, the court addressed the parties' cross-motions for summary judgment in the subdivision appeal, issuing a written decision largely in applicant's favor. The court reserved ruling, however, on the question of compliance with CDO § 5.2.2, which prohibits development on "lots that do not have frontage on a public road or public waters" except for "lots of record existing as of January 1, 2007, . . . if access to such road or public waters exists by a permanent easement or right-of-way at least twenty-five (25) feet in width."

¶ 8. Applicant had argued — and the City agreed — that although privately owned, Chittenden Drive qualified as a "public road" under the development ordinance. The trial court concluded, however, that the City's definition conflicted with the state's enabling statute, which provides that land development "may be permitted on lots that do not have frontage either on a public road or public waters, provided that access through a permanent easement or right-of-way has been approved" under the municipal bylaws. 24 V.S.A. § 4412(3). Although the enabling statute did not at the time of the application contain a definition of "public road," the term had been interpreted by this Court to be synonymous with "highway" as defined by 19 V.S.A. § 1(12), meaning essentially roads laid out "by statute or by dedication and acceptance." *Okemo Mountain, Inc. v. Town of Ludlow*, 164 Vt. 447, 454, 671 A.2d 1263, 1269 (1995).[2]

¶ 9. While finding that Chittenden Drive had not been formally dedicated and accepted and therefore did not meet this definition,

---

[2] Subsequent to applicant's 2009 subdivision application, the Legislature adopted a definition of "public road" that essentially incorporates the definition accorded the term in *Okemo* but also expressly includes class one, two, or three town highways as defined in 19 V.S.A. § 302(a) and class four highways at the municipality's discretion. See 24 V.S.A. § 4303(33), 2011, No. 155 (Adj. Sess.), § 13. The legislation also amended 24 V.S.A. § 4412(3) to authorize development "on either a public road, class 4 town highway, or public waters." 2011, No. 155 (Adj. Sess.), § 14.

the court nevertheless observed that it clearly connects with South Willard Street — a public road also known as Vermont Route 7 — and that this would normally bring the proposal within the exception for lots with "access" to a public road. The only difficulty with this conclusion, however, was the January 1, 2007 date restriction in the City ordinance, which appeared to bar development of any new "lot of record" resulting from an approved subdivision — a result the court found to be paradoxical and self-defeating. Accordingly, the court deferred to trial the question of whether the date restriction had any "rational relation to the purpose" of the frontage requirement.

¶ 10. Following an evidentiary hearing, the trial court issued a written decision and judgment order in April 2013. The court found that the "evidence presented provided no explanation" for the time limitation; that its literal application "would lead to an absurd result"; that the subdivision proposal otherwise met the exception; and therefore that the proposal qualified for a subdivision permit, subject to certain unrelated conditions. Applicant later filed a "motion to clarify," resulting in a modified judgment explaining and reaffirming the original ruling. DeForest and Friends then filed this appeal, which we consolidated with DeForest's appeal from the civil division for purposes of oral argument and review.

## I.

¶ 11. We turn first to the environmental court judgment granting the subdivision permit. Friends claim that the court erred in concluding that the date restriction in § 5.2.2 of the CDO is irrational and unenforceable.[3] See *Simendinger v. City of Barre*, 171 Vt. 648, 653, 770 A.2d 888, 895 (2001) (mem.) (noting that ordinance which is "irrational" is invalid). For the reasons that follow, however, we need not address this particular issue.

¶ 12. The threshold question before the DRB and the court was whether applicant's subdivision was authorized under the City's

---

[3] DeForest and Friends raised both separate and overlapping questions in the environmental court, and have filed separate briefs with this Court. Friends' brief, however, addresses multiple issues while DeForest's is confined to the single question of whether applicant's lot has the required frontage on a public road or easement, an issue which is also comprehensively addressed in Friends' brief. Accordingly, for convenience we shall refer to appellants jointly as "Friends" in this section dealing with the subdivision appeal.

development ordinance. To recall, § 5.2.2 of the CDO prohibits development on "lots that do not have frontage on a public road or public waters," so the first issue is whether the road fronting applicant's proposed subdivision, Chittenden Drive, constitutes a public road under the ordinance. For the definition of "road," the CDO directs the reader to "see street," which is defined, in turn, as "[a] public way as defined in Section 1-2 of the Code of Ordinances, or a *private way devoted to public use.*" CDO § 13.1.2. (Emphasis added.) The CDO defines a "public use" as "[a] use that is owned and operated by a public agency, or by a private/ non-profit entity for use by the general public without unreasonable restriction." *Id.* The City's Code of Ordinances reinforces these definitions, stating that a "street" includes "every way used for vehicular and pedestrian travel which has become public by authority of the law, *and such ways in public places other than highways as the public is permitted to use for vehicular and pedestrian traffic.*" Burlington Code of Ordinances § 1-2. (Emphasis added.) A "public place" includes "all streets." *Id.*

¶ 13. ■ It is clear from the foregoing that the City defines "public road" to include private streets open and accessible for use by the public for pedestrian and vehicular traffic, and that this definition applies to Chittenden Drive. Indeed, a senior planner with the City testified specifically that the CDO's definition of public road includes "private roads . . . open to the public and such is the case on Chittenden Drive." This view was echoed by the City's director of public works, who confirmed that Chittenden Drive was considered by the City to be a "public street." While Chittenden Drive remains in private ownership, the undisputed evidence established that it is open year round to the public for pedestrian and vehicular traffic, is routinely used by the public for that purpose, and is regularly plowed, sanded, swept, and generally maintained by the City's department of public works for that purpose, as well. The public works director explained that the City's policy is to sweep, plow, sand, and undertake minor repairs to Chittenden Drive and other private roads in the City to ensure their access to mail carriers, ambulances, fire trucks, and other safety vehicles. Thus, we have no difficulty concluding that applicant's subdivision proposal was authorized under the ordinance.

¶ 14. ■ As for whether the proposal comports with the enabling statute, as noted 24 V.S.A. § 4412(3) provides that land

development may be permitted on lots that do not have frontage on either a public road or public waters provided that it has approved access to a public road "through a permanent easement or right-of-way." Thus, regardless of whether Chittenden Drive meets the statutory definition of a public road as the City and applicant vigorously maintain, there is no question that it satisfies the alternative statutory basis for development as a "right-of-way" connecting to a public road. Therefore, we conclude that the proposal satisfies the statutory requirements for development, as well.

¶ 15. None of Friends' remaining claims requires extended discussion. They assert that the trial court erred in granting summary judgment on the subdivision proposal's compliance with CDO § 4.4.5, which sets forth a variety of dimensional standards for lots in residential districts. The trial court observed that Friends conceded the proposal "arguably [met] the dimensional requirements of the RL [Residential Low Density] District" under § 4.4.5 but claimed nevertheless that it was inconsistent with that section's "Purpose" statement, which provides, in part, as follows: "Development that places emphasis on architectural details and form is encouraged, where primary buildings and entrances are oriented to the sidewalk, and *historic development patterns* are reinforced." (Emphasis added.) Friends asserted below, and argue on appeal, that the proposed subdivision results in small and irregularly shaped lot sizes and an "angled" building envelope inconsistent with "historic development patterns" in the neighborhood.

¶ 16. ■ The trial court concluded, however, that the CDO language in question did not "constitute enforceable regulatory language." As we have observed, " '[b]road policy statements phrased as nonregulatory abstractions' are not equivalent to enforceable restrictions." *In re Chaves A250 Permit*, 2014 VT 5, ¶ 38, 195 Vt. 467, 93 A.3d 69 (quoting *In re John A. Russell Corp.*, 2003 VT 93, ¶ 16, 176 Vt. 520, 838 A.2d 906 (mem.)). The language relied on by Friends, "encourag[ing] . . . historic development patterns," is broadly aspirational rather than mandatory and sets forth no specific enforceable standards. See *id.* ¶¶ 40-41 (holding that town plan's policy of maintaining "man-made features . . . of local scenic, cultural and historic significance" contained "no specific requirements that are legally enforceable"); *In re JAM Golf, LLC*, 2008 VT 110, ¶¶ 13-14, 185 Vt. 201, 969 A.2d 47

(holding that ordinance which required design to "protect" natural resources created no enforceable standard). Accordingly, we find no error.

¶ 17. ■ In a similar vein, Friends assert that the trial court erred in failing to apply and enforce a provision in the statement of "principles" preceding the CDO's development review standards, stating that development shall "[c]omplement Burlington's architectural and cultural heritage by conserving and/or reflecting dominant design elements and characteristics of neighborhoods, and maintaining neighborhood proportions of scale and mass." CDO § 6.0.1(f). The trial court concluded, and again we agree, that while preceded by the mandatory "shall," the statement of principle in question provides no clear, specific, and enforceable standards to determine compliance with "dominant design elements" or neighborhood "characteristics." *In re JAM Golf*, 2008 VT 110, ¶ 14. We note, as well, that the section goes on to explain that development "principles" are generally drawn from "community goals . . . in adopted city plans" and are designed to provide guidance where more specific "individual standards appear to conflict." CDO § 6.0.1. This provision reinforces the conclusion that the "principle" in question was not framed or intended to serve as a mandatory and enforceable design standard. Accordingly, we find no error.

¶ 18. The court reached a similar conclusion with respect to Friends' claim that the partly-angled lot lines provided for in applicant's subdivision proposal violate the design-review provision of CDO § 6.1.2(c), captioned "Arrangement of lots." This section contains two short paragraphs, the first of which provides: "The size and arrangement of lots shall reflect and perpetuate the existing development pattern of the surrounding neighborhood. Lots shall be created in such a way as to enable their development pursuant to the requirements of this ordinance, and ensure a clear transfer of title." The court concluded that, like the provision of § 6.0.1 dealing with "neighborhood characteristics," the requirement of conformity with "development patterns of the surrounding neighborhood" was insufficiently precise to be meaningfully enforced, but should instead be read in conjunction with the second sentence to require "development pursuant to the" specific dimensional and design requirements that follow. In this regard, the court noted that the second paragraph of § 6.1.2(c) specifically provides that "[i]nterior lot lines extending from a

street should be perpendicular or radial to the street right-of-way line to the greatest extent feasible," that "[f]lag lots and through lots . . . shall be allowed only to the extent where topography and existing block and lot arrangement allow no suitable alternative," and that, in such cases, "frontage for access of 20-feet shall be required."

¶ 19. ■ The court went on to observe that Article 6 of the CDO specifically differentiates between design components that are "required ('shall')" and those that are "flexible ('should')." CDO § 6.0.1. The court further observed that the provision concerning perpendicular lot lines was expressly stated to be "flexible," and found that applicant's plan, which included lot lines that were both partially perpendicular and partially angled to accommodate the necessary street frontage, comported with the design component "to the greatest extent feasible." Although Friends dispute this finding, they have not shown that it was unfounded or clearly erroneous. See *In re Rinkers, Inc.*, 2011 VT 78, ¶ 8, 190 Vt. 567, 27 A.3d 334 (mem.) (noting that "[o]ur review of Environmental Court decisions is generally deferential," and that we will not disturb its findings unless clearly erroneous, nor its conclusions if reasonably supported by the findings).

¶ 20. Friends further assert that the trial court erred in holding that the proposal met the specific density limit of seven dwelling units per acre in the RL District, set forth in CDO § 4.4.5-2. The record does not show that this claim was properly preserved for review on appeal. In its summary judgment decision, the trial court observed that its earlier decision granting a permit for an accessory dwelling unit within applicant's existing single-family home resulted in a potential nonconformity with the density requirement, "as two dwelling units on that lot could result in a density of over seven dwelling units per acre." Accordingly, the trial court ordered applicant to revise her plan to comply with the density requirements, and to disclose the revised plan to the other parties at least thirty days prior to trial.

¶ 21. The record reveals that applicant thereafter mailed a revised plan to the court and opposing parties on January 15, 2013, and that the revised plan was subsequently admitted into evidence without objection at trial on February ·13, 2013. To address the court's concern, the revised plan increased the size of the lot with the existing house and accessory unit, although

applicant continued to maintain that the accessory unit should not count as a separate unit for measuring density. At the conclusion of the hearing, the trial court entered findings on the record approving the subdivision permit, and directed applicant to submit the revised plan to the City within sixty days, together with a certification that the plan conformed with the density requirements for two dwelling units on lot two and one dwelling unit on lot one.

¶ 22. ▮▮ ▮ The record does not disclose any objection to the revised plan on the ground that it continued to exceed the seven-unit per acre density limit, although the plan was disclosed before trial and admitted without objection and the parties continued to litigate issues relating to the proposal's compliance with the CDO both at trial and post-judgment. Accordingly, we conclude that the issue was not preserved for review on appeal. See *Agency of Natural Res. v. Glens Falls Ins. Co.*, 169 Vt. 426, 432, 736 A.2d 768, 772 (1999) (failure to raise claim at trial waives issue on appeal).

¶ 23. Friends' final claim concerning the subdivision proposal is that the trial court erred in concluding that it complied with CDO § 3.2.2(e), which broadly requires that subdivision applications conform to the dimensional standards in Article 4 and the development standards in Article 6. Having affirmed the trial court's determination that the proposal satisfied the requirements of both Articles, we find no merit to the claim.

II.

¶ 24. ▮ As noted, Friends has also briefed issues relating to the accessory-dwelling permit granted by the environmental court. While this appeal was pending, however, applicant moved to strike those portions of Friends' brief dealing with the accessory permit and to dismiss their purported appeal from that judgment on the ground that it was untimely. The record discloses that the trial court entered a judgment order granting the accessory-dwelling permit on December 14, 2012. The order concludes: "This completes the current proceedings before this Court." The record contains no separate appeal from this judgment. It would appear, therefore, that claims relating to the accessory-dwelling permit are not properly before us. See *Turner v. Turner*, 160 Vt. 646, 647, 641 A.2d 342, 344 (1993) (mem.) (noting that "[t]his Court lacks jurisdiction" where notice of appeal is not timely filed).

¶ 25. Friends maintain, however, that the two matters before the environmental court had been consolidated into one action, so that the accessory-dwelling case was not actually complete until the modified final judgment was entered in the subdivision case. The basis of the claim is a statement in the environmental court's March 2012 order returning the two cases to active status, in which the court referred to the matters as having been "previously consolidated for purposes of trial." The record contains no order or docket entry, however, partially or fully consolidating the two cases for any purpose, and two earlier docket entries in the subdivision appeal refer to the accessory-dwelling appeal as merely a "related case."

¶ 26. The record following the reactivation of the two appeals demonstrates, moreover, that the environmental court considered and treated them as separate matters. As noted, the court entered a final judgment in the accessory-dwelling appeal in December 2012, stating that the judgment order "completed" the proceedings. Shortly thereafter, the court ruled on the parties' cross-motions for summary judgment in the subdivision appeal, observing that it had already ruled in "a coordinated case" on applicant's request for an accessory dwelling permit. This reinforces the conclusion that the court may at one point have ordered a joint trial if it became necessary, but that is a qualitatively different matter from ordering the cases consolidated into one action. See V.R.C.P. 42(a) (providing that court may order "joint hearing or trial" of actions "involving a common question of law or fact," but may order the "actions consolidated" only with the "consent of the parties"); see *id.* Reporter's Notes (observing that Rule 42(a) "gives the court power to order either the joint trial of common questions . . . or, with the consent of the parties, the full consolidation of actions into a single action").

¶ 27. Four months later, moreover, in April 2013, the court entered a separate judgment order approving the subdivision, and thereafter, in June 2013, issued a modified judgment. The captions in both the original and modified judgment orders reference only the docket number in the subdivision appeal; there is no reference to the previously decided accessory-dwelling case. On July 15, 2013, Friends and DeForest Realty filed separate, timely appeals from the modified judgment. Tellingly, the notice of appeal in each instance referenced only the docket number in the subdivision case. Friends' notice of appeal, moreover, states expressly that

they are appealing from the environmental court decision "approving with conditions [the] application for a two-lot subdivision." There is no reference to the environmental court's decision approving the accessory dwelling.

¶ 28. ■ From the record, therefore, it is apparent that the environmental court did not order or consider the two cases to be consolidated into one action pursuant to V.R.C.P. 42, and equally clear that Friends' appeal pertains solely to the environmental court judgment granting the subdivision permit. Accordingly, we are without jurisdiction to review the judgment granting the accessory dwelling permit. *Turner*, 160 Vt. at 647, 641 A.2d at 344.

### III.

¶ 29. ■ In its related appeal from the civil division, DeForest contends the trial court erred in concluding that applicant had an implied easement to access Chittenden Drive from the vacant lot created by the subdivision. In reaching this conclusion, the trial court relied on our decision in *Clearwater Realty Co. v. Bouchard*, where we endorsed the "familiar principle of law that where lots are sold by reference to a recorded plat, lot purchasers acquire the right to keep open and use roads, streets, highways, and park areas as indicated on the plat." 146 Vt. 359, 363, 505 A.2d 1189, 1191 (1985). In keeping with the rule's purpose of "secur[ing] to persons purchasing lots . . . those benefits . . . which, it is reasonable to infer, has induced them to buy," we held that the right extended to all of the roads, parks and other common areas shown on the plat, not just those that touch the purchaser's land or which are strictly necessary for the enjoyment of the property. *Id.* at 363-64, 505 A.2d at 1192 (quotation omitted). Later, in *Lalonde v. Renaud*, we clarified that *Clearwater* set forth an "objective test," granting rights to purchasers and their successors without the requirement of demonstrating "specific reliance on depictions in the plat." 157 Vt. 281, 283, 597 A.2d 305, 306 (1989); accord *Noble v. Kalanges*, 2005 VT 101, ¶ 18, 179 Vt. 1, 886 A.2d 767.

¶ 30. Applying these principles to the facts here, the trial court concluded that the purchasers of Lot 76 and their successors-in-interest acquired an implied easement to access the streets depicted on the recorded plat for the Overlake Park development, observing that road access "was an obvious inducement to any

purchaser," and further concluded that this right included an implied easement from the additional lot created by the subdivision.[4]

¶ 31. ■■ On appeal, DeForest concedes applicant's right to an implied easement for the purpose of accessing Chittenden Drive from her current residence, but contests the trial court's conclusion that this right extends to the additional lot created by the subdivision. DeForest claims that the court's ruling in this regard impermissibly expands the scope of the implied easement beyond the reasonable expectations of the parties. We find no error. As the record plainly showed, the restrictive covenant limiting lots in the Overlake Park development to one single-family home expired by its terms in 1995. Thus, as the trial court concluded, a prospective purchaser could reasonably expect to subdivide his or her lot after that date — so long as the subdivision complied with current zoning regulations — and could also reasonably expect to enjoy access from any such future development to the streets depicted on the plat, just as from the original lot. The intentions and reasonable expectations of the parties — as evidenced by the recorded plat and written deeds — therefore fully support the conclusion that applicant has an implied easement from the subdivision lots to Chittenden Drive.

¶ 32. ■■ DeForest argues that the trial court's ruling violates the principle that implied easements are disfavored and may not be enlarged beyond their original purpose. We have indeed observed that easements by implication are limited to the use which gave rise to the implication, and can "neither be enlarged because of subsequent necessity nor cut down by a claim that some part of it was not indispensable." *Read v. Webster*, 95 Vt. 239, 247, 113 A. 814, 818 (1921) (quoted in *Traders, Inc. v. Bartholomew*, 142 Vt. 486, 494, 459 A.2d 974, 980 (1983)). As the trial court here cogently observed, however, the scope of the implied easement in this case is "not defined by principles of necessity . . . [but] by reference to the reasonable expectations of the purchasers," expectations which — as discussed — included

---

[4] Although not cited by the trial court, the fact that the original plat map depicts Chittenden Drive as a fifty-foot right-of-way directly adjoining Lot 76, rather than a paved thirty-foot road with ten-feet of green space on either side, reinforces the conclusion that the purchasers of Lot 76 enjoyed a reasonable expectation of roadway access.

future development. DeForest also cites the general principle that the owner of an easement may not "materially burden" the servient estate (in this case the ten-foot strip owned by DeForest between applicant's lots and Chittenden Drive) "beyond what was intended." *Preseault v. City of Burlington*, 2006 VT 63, ¶ 12, 180 Vt. 597, 908 A.2d 419 (mem.). Here again, however, the trial court was correct in its observation that it was not "increasing the burden of the easement" but simply defining the "original . . . easement to include future development which was contemplated."

¶ 33. Finally, DeForest asserts that the trial court erred in holding that the implied easement benefiting the newly subdivided lot[5] includes the right to cross the ten-foot strip for the purpose of connecting to the water and sewer lines owned by DeForest.[6] DeForest is correct in noting that these utilities were not depicted on the plat map for Overlake Park, and that our cases dealing with implied easements by reference to a plat map have not considered access to utilities.

¶ 34. ▮▮ It is well settled in Vermont and elsewhere, however, that an implied easement by necessity may arise by operation of law where it is essential to the "reasonable enjoyment of [the] land," *Berge v. State*, 2006 VT 116, ¶ 12, 181 Vt. 1, 915 A.2d 189, and that this principle incorporates access to essential utilities. See *McElroy v. McLeay*, 71 Vt. 396, 398-99, 45 A. 898, 899 (1899) (recognizing implied easement for access to public sewer line as "within the rule that everything . . . that is essential to the beneficial use and enjoyment of the property designated in the grant is . . . to be considered as passing by the grant"); see also *Brown v. Miller*, 95 P.3d 57, 61 (Idaho 2004) (holding that easement by necessity "reasonably includes utilities"); *Smith v.*

---

[5] DeForest conceded below applicant's right to connect her existing home to the utilities underlying the road.

[6] The court's judgment order granted applicant an implied easement across the ten-foot strip for purposes of ingress and egress, as well as the right to connect to "utility lines, including but not limited to, water, sewer, power, and communications, that may be necessary for the use and enjoyment of said property, including but not limited to, the construction and use of dwellings on any lot that may be created by a subdivision of [applicant's] property." Despite this clear judgment, the trial court's actual decision granting summary judgment did not expressly address the utility question. However, because the issue was raised and litigated below and briefed on appeal, and the trial court's conclusion is clear from the judgment, we see no impediment to addressing the issue here.

*Heissinger*, 745 N.E.2d 666, 671-72 (Ill. App. Ct. 2001) (rejecting assertion that easement by necessity is limited to ingress and egress, and holding that it may exist for access to power, telephone, water, and sewer lines); *Morrell v. Rice*, 622 A.2d 1156, 1160 (Me. 1993) ("An easement created by necessity can include not only the right of entry and egress, but also the right to make use of the easement for installation of utilities, essential for most uses to which property may reasonably be put in these times."); *Huggins v. Wright*, 774 So. 2d 408, 412 (Miss. 2000) (affirming grant of "easement of necessity . . . for ingress/egress and for utilities"); see generally 1 Restatement (Third) of Prop.: Servitudes § 2.15 cmt. d (2000) (observing that "increasing dependence" on access to utilities for reasonable enjoyment of property supports recognition of easement by necessity).

¶ 35. Given that the property here is residential in character, that development is impossible without access to utilities, and that — absent any evidence to the contrary — any additional burden to the servient estate by allowing access to the utility lines is seemingly minimal, we have no difficulty concluding that such access is necessary to the reasonable enjoyment of the property, and that applicant is therefore entitled to an implied easement by necessity for this purpose. Moreover, given the reasonable expectation that purchasers of lots within the Overlake Park development could subdivide their property after 1995, we find no obstacle to the recognition of an easement by necessity to both of the subdivided lots. See *Morrell*, 622 A.2d at 1161 (rejecting claim that easement by necessity for utilities must be limited "to serve only a single-family use of the . . . property" where "[t]here was no evidence that the only lawful use of the . . . land would be for one single-family home"). Accordingly, we affirm the judgment on this basis. *Caledonian-Record Publ'g Co. v. Vt. State Coll.*, 2003 VT 78, ¶ 7, 175 Vt. 438, 833 A.2d 1273 (we may affirm where law and evidence support "the same result as the trial court but based on different reasoning").

*Affirmed.*