NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 96

No. 2015-406

In re Wagner & Guay Permit                                      Supreme Court
(Mary Bourassa, Appellant)

                                                                On Appeal from
                                                                Superior Court,
                                                                Environmental Division

                                                                March Term, 2016


Thomas G. Walsh, J.

David Bond of Strouse & Bond, PLLC, Burlington, for Appellant.

Robert F. O'Neill and Matthew S. Stern of Gravel & Shea PC, Burlington, for Appellees
  William and Barbara Wagner.


PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.    **DOOLEY, J.**  Neighbor Mary Bourassa appeals the Environmental Division's affirmance of a zoning permit application by Philip and Barbara Wagner and Christopher Guay (collectively, applicants) seeking to construct a single family residence and detached garage on two merged lots of a six-lot subdivision in Grand Isle, Vermont.  Neighbor, an owner of another lot in the subdivision, opposes development, chiefly on the ground that the proposed house will not be constructed within the "tree line" on the property, as required by the subdivision plat plan. We affirm.

¶ 2.    In February 1995, the Grand Isle Planning Commission approved the Wagners' six-lot subdivision on Dodge Terrace.  Dodge Terrace is a dead-end road running along the south

edge of a large field. It is bordered by a row of trees, which run parallel to the south side of Dodge Terrace and denote the beginning of a wooded area that stretches south from the road into a wetland. The subdivision's plat plan, authored by Mr. Wagner, was approved by the Planning Commission on April 4, 1995, and was recorded two days later. As relevant to this appeal, the plan contains a scalloped line labelled as "existing edge of the woods" and defined in the legend as the "tree line boundary." On the plan, in-ground septic systems are generally located to the north of the scalloped line and house sites are located to the south of the line. The plan contains a note that states that the location of all houses and drives are for "illustrative purposes only," but adds "with provision that the houses for lots 2-6 must be within the tree line."

¶ 3.     The Wagners own lots 3 and 4 of the subdivision. Neighbor owns and resides at lot 2 of the subdivision. The Wagners seek to sell their lots to Mr. Guay with the intention of adjusting lot lines, merging lots 3 and 4 into a single lot, and building a single-family residence and detached garage on that combined lot. In accordance with that plan, applicants submitted a zoning permit application to the town in June 2014, with an accompanying unscaled sketch plan featuring the locations of the proposed residence and garage. Mr. Wagner testified during the town's review of the application that the house's setback distances from Dodge Terrace, as depicted on the sketch plan, were "distances from the front corners of the proposed house to the southern edge of the traveled way of Dodge Terrace." The town's Development Review Board (DRB) granted that permit on October 1, 2014.

¶ 4.     On October 13, 2014, neighbor appealed the town's decision to the Superior Court, Environmental Division by filing the following statement of questions:

1. Should the Application be denied as inconsistent with section 2.4 of the Town of Grand Isle's Zoning Bylaws and Subdivision Regulations (the "Zoning Bylaws") which provides that "[t]his Bylaw must not repeal, abrogate, or impair other land use controls (including . . . easements, deed restrictions, covenants or similar devices.")?

2

2. Should the Application be denied as inconsistent with the original approved plat plan for the development, as set forth on Map Slide 21 of the Town's Land Records, which provides that the locations of houses on lots 2 through 6 of the development "must be within the tree line"?
3. Should the Application be denied under section 2.4 of the Zoning Bylaws as abrogating or impairing the covenants and restrictions in the deeds for lots 2, 5 and 6 of the development, where each deed expressly references and incorporates the provisions of Map Slide 21, and where each deed provides that all structures shall be within the tree line, as depicted on Map Slide 21?
4. Should the Application be denied under section 2.4 of the Zoning Bylaws as abrogating or impairing the covenants and restrictions in the deeds for lots 2 and 6 of the development, where each deed expressly provides that "no pre-fabricated dwellings, including but not limited, to mobile homes or double-wide dwellings shall be erected on the premises"?
5. Should the "tree line" referenced in the plat plan and above-referenced deeds be defined as the sketched location of the edge of the forest canopy shown on Map Slide 21 or as the actual location, measured from tree trunk to tree trunk?
6. Should the Application be denied as inconsistent with the provisions of the Town Plan that mandate preservation of open spaces, views, and vistas, as incorporated by reference into the Town's Zoning Bylaws under section 1.1 of the Bylaws?
7. Should the Application be denied under section 5.10 of the Bylaws in that it involves a boundary line adjustment that substantially changes the nature of the development?
8. Should the Application be denied on account of multiple material misrepresentations of fact made by the Applicants in connection with their Application?
9. Should [neighbor] be awarded the legal fees, costs, and expenses they incurred on account of the multiple material misrepresentation [sic] of fact by the Applicants?

On December 22, 2014, applicants filed a motion to dismiss neighbor's questions 1, 3, 4, 6, 8, and 9. The Environmental Division granted the motion in part and denied it in part, dismissing questions 1, 3, and 4 on the ground they raised "issues regarding private property rights, which are outside [the Environmental Division's] jurisdiction" and dismissing question 6 on the ground that it relied on the Town Bylaws' purpose provisions, which "have no direct regulatory effect."

3

Following unsuccessful summary judgment motions from both sides, the Environmental Division held a trial on September 21-22 of 2015. The court also visited the site on September 22.

¶ 5. On October 1, 2015, the Environmental Division issued its decision on the merits affirming the grant of applicants' permit. The court noted that both sides had provided expert opinions, which "generally agree[d]" on the location of the scalloped tree line boundary identified on the 1995 Plat Plan; the experts both located the trunks of actual mature trees "farther south" from Dodge Terrace than the line boundary and located the mature tree dripline as it exists today as "the same distance north" of the scalloped line. The court thus identified the primary contention between the parties as whether the "tree line" on the Plat Plan should be interpreted as the edge of the canopy or "dripline"—that is, the line between the open meadow and the branches of the trees in the forested area—or the location of the first mature tree trunks in the forested area.[1] The court began its analysis by observing that its principal concern in construing permit conditions was to implement the intent of the drafters; thus, it considered testimony from Mr. Wagner, the original designer of the subdivision, as to the meaning of the phrase "within the tree line." Mr. Wagner testified that he intended that houses "be nestled within the trees" and "have views into the meadow" and that the purpose of the tree line condition was to ensure that houses on lots 2 through 6 "not appear to be sitting within the center of the meadow." By contrast, plaintiff and another homeowner testified that "they thought Mr. Wagner told them," when they were considering purchasing land in the subdivision, that all houses were required to be behind or south of the mature tree trunks.

¶ 6. The Environmental Division credited Mr. Wagner, concluding that the scalloped line on the Plat Plan is "not intended to show the location of the trunks of mature trees, but rather

---

[1] Although there may be differences in the canopy's extent between the time of trial and the time of the plat plan's drafting, these differences are not relied upon by the parties in making arguments to resolve this case. Thus, we do not consider the issue.

4

the line between the open meadow area and the forested area." The court was particularly persuaded by the testimony of neighbor's surveying expert, who stated at trial that a scalloped line on a plat "typically represents the edge of the open area, or in other words, the division between woods and a field."

¶ 7. The court relied on this determination in answering question 2. It noted that the survey plan created by neighbor's expert showed applicants' proposed house was located 98 to 109 feet from the center of the traveled way of Dodge Terrace. Although Mr. Wagner acknowledged that the measurements on the plan accompanying his application to the town "could reasonably be interpreted" to show setback distances from the center of Dodge Terrace, the court found that Mr. Wagner "credibly testified during trial" that he had informed the town that measurements were intended to be from the edge of the travelled right of way, as shown on the survey plan created by his retained expert witness. Because the proposed house is to the south of the tree-line boundary— "on both experts' surveys"—when measured from the southern edge, the court found that the planned house comported with the 1995 Plat Plan as being within the tree line. The court also found that the proposed boundary adjustment would "not substantially change the development or create new lots," as it would maintain the subdivision's "rural nature" and would involve the construction of only one house where, because two lots were to be merged, two would have been possible. Finally, the court dismissed neighbor's argument that the applicants misrepresented the distance of the house from Dodge Terrace as being measured from the center of the road, rather than the edge. The court noted that, because this was a de novo hearing, alleged inaccuracies in materials presented to the municipal panel— which Mr. Wagner testified he had corrected—were irrelevant, where Mr. Wagner "credibly testified" at trial that the corners of the house were measured from the edge of the traveled way. The court found "no statutory authority" for awarding legal fees and "no conduct of [applicants] justifying even the consideration of awarding fees." The court also concluded its opinion with

5

the following language: "This decision does not address compliance with other potentially relevant town and state reviews, including, but not limited to, wetland and wastewater programs." This timely appeal followed.

¶ 8. On appeal, neighbor makes the following arguments: (1) that the phrase "within the tree line" is inherently ambiguous and so must be construed against the drafter; (2) that equitable estoppel should bar consideration of Mr. Wagner's testimony as to the meaning of the phrase "the tree line"; (3) that the proposed house is not within the tree line; (4) that the zoning bylaws and the permits issued pursuant to the zoning bylaws cannot be construed to impair private land-use controls; (5) that the failure to disclose the fact that the proposed structure encroached upon the wetland setback was a material change warranting denial of the application and; (6) that the applicants' misrepresentations warrant an award of attorney's fees.

¶ 9. Although this Court reviews the Environmental Division's legal conclusions under a de novo standard, "we will uphold those conclusions if they are reasonably supported by the findings. We will defer to the court's factual findings and uphold them unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 21, 199 Vt. 19, 121 A.3d 630 (quotations and citations omitted).

¶ 10. Neighbor's first, and central, argument is that the Environmental Division's interpretation of the phrase "within the tree line" was "clearly erroneous." Neighbor maintains that because the phrase is inherently ambiguous, it must, as per the rule of contra proferentem, be construed against the drafter and proffering party—here, Mr. Wagner—such that neighbor's interpretation of the "tree line" as referring to a line drawn along the trunks of mature trees closest to the road must control. We disagree.

¶ 11. We begin by noting that neighbor's assertion that permit conditions should be interpreted under the same principles as private contracts has no basis in our law. Instead, as we held in Agency of Natural Resources v. Weston, permit conditions are construed according to

6

normal rules of statutory construction. 2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.); accord Sec'y v. Handy Family Enters., 163 Vt. 476, 481, 660 A.2d 309, 312 (1995). In Weston, a landowner received a 1989 permit allowing him to subdivide his 146-acre property when he set aside a single, thirty-three acre parcel for agricultural use. The permit contained a condition requiring the landowner to maintain the thirty-three acres as "open, cleared, uncluttered and unencumbered land"; the landowner was also required to "at a minimum . . . cut the hay from the Agricultural Area twice each year and . . . fertilize the area at least once every three years." 2003 VT 58, ¶ 2. The landowner complied with the permit conditions for approximately ten years without issue. However, in 2002, following a series of site visits and notices of violation, the Agency of Natural Resources issued an administrative order finding, in pertinent part, that by failing to cut hay on the parcel, the landowner had violated a condition of his permit. Id. ¶ 8. The Environmental Division affirmed this finding.

¶ 12. On appeal to this Court, the landowner argued that the Environmental Division misinterpreted the condition, suggesting that the purpose was "simply to assure that the thirty-three-acre parcel [was] left open and its soil kept arable for agricultural purposes." Id. ¶ 15. We noted:

> In construing permit conditions, we rely upon normal rules of statutory construction. Our principal concern is to implement the intent of the draftpersons. Ordinarily, we do so by accepting the plain meaning of the words because we presume that they express the underlying intent. We also keep in mind, however, that because land-use regulations are in derogation of property rights, any uncertainty in their meaning must be decided in favor of the property owner. . . . Finally, we must accord deference to the environmental court's construction of a permit condition, particularly when the court's expertise will assure consistent interpretations of the law.

Id. ¶ 16 (quotations and citations omitted). Thus, reading the condition "in its entirety" and ensuring uncertainties were "read in favor" of the landowner, we determined that while the environmental court did not err in finding a violation, it had misconstrued the condition, which

7

was primarily intended to require the landowner to keep the property "open and available for agricultural use, so that if it is not being put to any other agricultural use . . . it must, at minimum, be hayed and fertilized." Id. ¶ 17 (emphasis added).

¶ 13.    Applying Weston to the facts of this case, we note that the parties' central dispute is over the phrase "within the tree line," which appears in the 1995 Plat Plan drafted by Mr. Wagner and unchanged in the review process. Because it is "the function of a subdivision permit . . . to approve 'plats of land,' . . . recorded plats necessarily become subdivision permit conditions." In re Stowe Club Highlands, 164 Vt. 272, 276, 668 A.2d 1271, 1275 (1995) (quoting 24 V.S.A. §§ 4401(b)(2), 4415). Although we would note that even neighbor's expert stated in his trial testimony that a scalloped line "generally represents the edge of an open area" and "typically . . . would demark the limit of an open area and a treed area"—thereby supporting applicants' position that the tree line refers to a line between the open meadow and forested area and not to the trunks of the trees—we accept for purposes of analysis neighbor's contention that the tree line restriction is ambiguous, as there is "no plain meaning" apparent from its use in the context of the Plat Plan. Wright v. Bradley, 2006 VT 100, ¶ 7, 180 Vt. 383, 910 A.2d 893. We agree with applicants, however, that the phrase could mean the edge of the open area where tree branches provide shade and start to define the wooded area, as well as the trunks of the mature trees closest to the road. Our goal must be to "implement the intent of the draftpersons." Weston, 2003 VT 58, ¶ 16 (quotation omitted). Normally, this would mean the intent of the appropriate municipal panel that imposed the land-use condition, in this case the Grand Isle Planning Commission. The evidence showed, however, that the plat plan containing the condition was submitted by Mr. Wagner, and the condition was not required by Grand Isle zoning or subdivision regulations and was unchanged in the Planning Commission's

8

deliberation.[2] Accordingly, we agree that Mr. Wagner's evidence of intent was relevant and admissible, and the Environmental Division properly relied upon it.

¶ 14.   At trial, Mr. Wagner affirmed that the "tree line concept was solely [his] own" and was included as a condition because he wanted houses to be visually screened; in other words, he and his wife wanted the houses to be "nestled within the treed area such that they would have a view of the meadow." He acknowledged in response to a question from neighbor's counsel that while he agrees with the "general proposition" that "if you look up tree line in a dictionary, you will get different definitions," he believed that "generally speaking, the common or ordinary meaning of tree line [is] the edge of the woods." Mr. Wagner also testified that he had surveyed the tree line; he had held the stadia rod to take survey points of the tree line as it ran parallel to Dodge Terrace and provided a tabulation of this survey data to the court, which showed eight survey points taken for the edge of the woods. He averred that the "sole purpose" of this survey was "to document the tree line that became depicted on the plat plan." Mr. Wagner also stated that he "staked corners of all the properties" so as to be "very clear" as to where the front of a house could be relative to the tree line boundary; moreover, in addition to placing and maintaining those stakes, he "showed" them to every prospective buyer.

¶ 15.   Mr. Wagner also responded to questions from neighbor regarding a 2002 draft purchase and sale agreement made with neighbor—that was not entered into or signed by either party—that stated "Approximate tree line: Actual tree line is to be field located. No house or portion thereof is to extend north of the tree line." He indicated that that language was meant to elucidate that for accurate locations of property and tree lines, reference should be made to the

---

[2] The Planning Commission approval came at the meeting of February 21, 1995. A member of the commission amended the approval motion to say: "Phil Wagner shall have the right to move the houses and driveways on all lots subject to the Town Bylaw requirements. The houses on lots 2-6 MUST [be] within the tree line." We read the last sentence to be a restatement of the phrase that was already in the plat plan, and as such, was not an indication of a separate intent in the Planning Commission.

actual plat plans, rather than to the accompanying hand-drawn sketch that merely approximated the tree line. He disagreed with neighbor that the language in the agreement was confusing to purchasers, noting that potential purchasers had the plat plan in front of them and so could ascertain what was being referred to and that if the tree trunks governed the tree line, it would be illogical to have a line on the map or tell purchasers the line was to be field located, as all they would have to do was stake the house to identify the required setback. Finally, Mr. Wagner agreed that the trees as they existed in the field at the time of the trial were "irrelevant" and that the line drawn on the plat plan is the boundary for construction on lots 2 through 6.

¶ 16. Because discerning the meaning of the ambiguous phrase "within the tree line" was a matter of identifying intent, as revealed through trial testimony, we defer to the Environmental Division's decision. See In re Entergy Nuclear Vt. Yankee Discharge Permit 3-1199, 2009 VT 124, ¶ 15, 187 Vt. 142, 989 A.2d 563 (noting that it is role of environmental court to "determine[] the credibility of witnesses and weigh[] the persuasive effect of the evidence"). Here, we believe that ample evidence existed to support the Environmental Division's conclusion that the phrase "within the tree line" and the scalloped line on the 1995 Plat Plan were intended to reflect the line between the open meadow area and the forested area, rather than the current location of the trunks of mature trees. The court repeatedly referred to Mr. Wagner as a "credible" witness, and noted his testimony accorded with that of neighbor's expert with respect to the use of a scalloped line on plat plans. The court also contrasted Mr. Wagner's testimony with that of neighbor and her witness, whose impressions of the phrase "within the tree line" was "not related" to the 1995 Plat Plan or the phrase itself, but rather, what they "thought Mr. Wagner told them when they considered buying lots." Because neighbor has not shown that there is "no credible evidence" to support the Environmental Division's factual findings, we decline to disturb them on appeal. Id. We uphold the Environmental Division's conclusion that the tree line of the Plat Plan refers to the depicted scalloped line and the

10

scalloped line was intended to show the edge of the canopy or dripline without regard to the actual locations of the tree trunks.

¶ 17.  Having resolved that the Environmental Division did not err in defining "within the tree line," the dispute about whether the proposed house is within the tree line is resolved. The Environmental Division found that the "uncontroverted and uniform testimony of both surveying experts" placed the house a few feet south of—but nevertheless "within"—the tree line boundary as shown on the Plat Plan, and neighbor has introduced no further evidence or argument to disturb this finding on appeal.

¶ 18.  Neighbor's second argument is that the Environmental Division could not rely on Mr. Wagner's testimony as to the meaning of the phrase "the tree line" because such testimony should be barred by equitable estoppel.  She claims that "[t]he homeowners testified unanimously that they were expressly led to believe that the 'tree line' consisted of the tree trunks" and that, in reliance on his words and actions, these homeowners purchased lots within the development.  She contends that although Mr. Wagner "never contradicted this testimony," the court never made any findings or addressed the issue.  We conclude that the argument was not considered by the Environmental Division because it was not properly raised.  Accordingly, it is not preserved for appeal, and neighbor is not entitled to reversal on this ground.

¶ 19.  We have long held that "the trial court may not be put in error by an appellant advancing a theory on appeal that was not raised before the trial court."  Labate v. Rutland Hosp., Inc., 2015 VT 128, ¶ 25, __ Vt. __, 132 A.3d 1083; accord O'Rourke v. Lunde, 2014 VT 88, ¶ 17, 197 Vt. 360, 104 A.3d 92 ("Generally, issues that are not presented to the trial court cannot be raised on appeal.").

¶ 20.  Here, neighbor claims that she "expressly argued" that equitable estoppel should bar inconsistent testimony from Mr. Wagner, but that nevertheless, the "court did not address the issue."  However, none of her filings with the trial court—her initial statement of questions,

motion for summary judgment, and motion for judgment as a matter of law—reference a claim of equitable estoppel. The only mention of equitable estoppel in the entire record can be found in the trial transcript, where neighbor attempted to introduce Exhibit J, a 2002 draft agreement of purchase and sale between the Wagners and neighbor and her former husband, and applicants challenged admission on relevance grounds. Neighbor's attorney argued that the draft agreement, which stated that the "[a]ctual tree line is to be field located," undermined Mr. Wagner's credibility and operated to equitably estop him from "tak[ing] the position that the tree line is as he claims today."

¶ 21. Setting aside the fact that the writing in question was an unsigned document created during negotiation, see LeBlanc v. Snelgrove, 2015 VT 112, ¶ 44, __ Vt. __, 133 A.3d 361 (outlining elements of equitable estoppel), a passing reference to a legal theory during trial is not "sufficient proof" for that theory such that we can consider it here. Roberts v. Chimileski, 2003 VT 10, ¶ 14, 175 Vt. 480, 820 A.2d 995 (mem.)) ("As is so often the case, plaintiffs fully stated their new theory for the first time only in this Court, after their initial theory failed in the trial court. Therefore, we find that plaintiffs failed to raise below and offer sufficient proof for their new theory, and we will not address this issue here."). The purpose of our rule on preservation is to provide the factfinder with the chance "to consider the matter in the first instance"; neighbor's passing reference to her theory was inadequate to afford the trial court the opportunity to reflect and rule on its merits. Houle v. Ethan Allen, Inc., 2011 VT 62, ¶ 11, 190 Vt. 536, 24 A.3d 586 (mem.) (quotation omitted). We therefore decline to consider that argument here.

¶ 22. We reach a similar conclusion regarding neighbor's argument that applicants' failure to disclose the fact that the proposed structure encroached upon the wetland setback constituted a material change warranting rejection or remand of their zoning application. Neighbor's statement of questions to the Environmental Division made no mention of the

wetland requirements, and she failed to elucidate at trial what bearing the Grand Isle zoning regulations had on state wetland setback requirements. See Vermont Rules of Environmental Court Procedure 5(f) ("The appellant may not raise any question on the appeal not presented in the statement as filed, unless otherwise ordered by the court."). When neighbor moved for judgment as a matter of law on the grounds that applicants' plan was a material change because the site was "well into the wetland buffer," the court denied the motion, citing Mr. Wagner's testimony that he provided additional information to the DRB regarding the location of the house—discussed supra, ¶ 28—as well as the fact that the court "did not see how wetlands [were] at issue before the court in this matter," as the case related only to the DRB's review of the application. The court even concluded its decision on the merits by stating that the opinion "does not address compliance with . . . wetland and wastewater programs."

¶ 23. To that end, we decline to take up neighbor's contention that applicants' permit failed to comply with wetland setback requirements. However, we stress that that does not mean we have found compliance with those requirements in this appeal. We merely note that, if the house does encroach on the wetland buffer, it is incumbent upon applicants to seek a state permit. Neighbor or any other interested party can contest the failure to seek such a permit or the entitlement to permit if sought.

¶ 24. Next, neighbor argues that the Environmental Division erred in dismissing three of her initial questions, which bore on whether applicants' permit application was inconsistent with the covenants and restrictions in the deeds for lots 2, 5, and 6. The court ruled on the ground that the questions raised issues regarding private property rights, thus putting them outside the scope of the Environmental Division's jurisdiction. Neighbor cites Section 2.4, "General Purpose, Interpretation and Applicability," of the Grand Isle Zoning Bylaws, which states that the bylaw "must not repeal, abrogate, or impair any other land use controls (including easements, deed restrictions, covenants, or similar devices)," to support her claim that the town is

13

barred from issuing zoning permits that would "run counter to the terms of the covenants and restrictions in the deeds," as well as the terms of the subdivision permit.

¶ 25. We recently explained the relationship between deed covenants and zoning regulation in Blanche S. Marsh Inter Vivos Trust v. McGillvray, where a plaintiff received a zoning permit, affirmed by the Environmental Division, to reconfigure lot lines in her parcel within a subdivision and to construct a home on a second lot. 2013 VT 6, ¶ 1, 193 Vt. 320, 67 A.3d 943. However, neighbors brought an action in the Civil Division alleging that the plaintiff's development plans violated a deed covenant, and the Civil Division upheld the neighbors' position, ruling that the planned development "violated the applicable restrictive covenants and deed restrictions." Id. On appeal, the plaintiff argued that the Civil Division lacked jurisdiction over the action in light of the Environmental Division's ruling affirming the grant of the permit. Id. ¶ 18. We held that the plaintiff's argument rested on a misunderstanding of the relationship between covenant restrictions and zoning regulations and the methods of enforcement, which we described as "distinct." Id. ¶ 19. We explained that the zoning decision had no claim or issue preclusion effect with respect to the covenant enforcement action, id. ¶ 22, and added: "Nothing in the [town's] Master Plan could or does purport to disrupt established private property rights or obligations, or to lessen plaintiff's obligations pursuant to her deed and covenants, and the Environmental Division's recognition that the Master Plan is conclusive authority in the event of a conflict with other documents relates specifically to the zoning context." Id. ¶ 23.

¶ 26. In light of McGillvray, we view section 2.4 of the zoning bylaw as a general statement of the legal effect of zoning regulation rather than a specific zoning restriction. This interpretation is reinforced by its placement among the general purposes of the bylaws. We have repeatedly held that general statements of purpose "[do] not constitute enforceable regulatory language" binding administrative and judicial bodies. Regan v. Pomerleau, 2014 VT 99, ¶ 16,

14

197 Vt. 449, 107 A.3d 327 (quotation omitted); see also In re Howard Center Renovation Permit, 2014 VT 60, ¶ 16, 196 Vt. 542, 99 A.3d 1013 (concluding introductory purpose statement outlining goals of Land Development Regulations does not "establish an enforceable standard for evaluating zoning permits . . . much less a standard which provides adequate notice to property owners and guidance to municipal decisionmakers"); In re Meaker, 156 Vt. 182, 185, 588 A.2d 1362, 1364 (1991) (holding that "the purpose statement of the [town's] bylaws has no direct regulatory effect").

¶ 27.     Neighbor argues, however, that the language has a much greater effect than a statement of the existing law.  She claims that the language requires the town to declare that violation of a deed covenant is also a violation of the zoning bylaw.  We are unable to find that meaning in the bylaw language.  It does not logically follow, as neighbor argues, that the negative language of the purpose statement—precluding repealing, abrogation, or impairment— is simultaneously an affirmative directive that mandates the town to enforce private contractual land use restrictions through the zoning bylaws.  Assuming the town could take on that responsibility as part of its zoning powers, neighbor's asserted interpretation of the language unreasonably stretches its plain meaning.  See Nelson v. Town of Johnsbury Selectboard, 2015 VT 5, ¶ 12, 198 Vt. 277, 115 A.3d 423 ("We start with the plain language of the statute and will enforce it according to its terms if the language is clear and unambiguous.").   Nowhere in the specific restrictions of the bylaws is there support for such an interpretation.  Thus, we affirm the decision of the Environmental Division to dismiss claims based on the deed covenants.

¶ 28.     Neighbor's final argument is that under 24 V.S.A. § 4470a, she should be granted fees and costs incurred based on the Wagners' material misrepresentations of fact.  Specifically, neighbor argues that the permit application Mr. Wagner presented to the DRB "failed to identify the fact that the proposed house intruded well into the wetland setback"; neighbor contends that

had Mr. Wagner made such a presentation, "it seems likely the DRB would have denied him a permit," thus saving neighbor attorney's fees. We disagree.

¶ 29. Section 4470a states that

> An administrative officer or appropriate municipal panel may reject an application under this chapter . . . that misrepresents any material fact. After notice and opportunity for hearing in compliance with 3 V.S.A. § 809, an appropriate municipal panel may award reasonable attorney's fees and costs to any party or person who may have become a party but for the false or misleading information or who has incurred attorney's fees or costs in connection with the application.

This is a question of first impression; we have never construed this statute. We have, however, defined "misrepresentation" in the context of a permit application as requiring "a showing that [an applicant] knowingly made a false representation of fact, or knowingly concealed facts, with the intention to mislead or deceive." In re Beckstrom (H.A. Manosh), 2004 VT 32, ¶ 14, 176 Vt. 622, 852 A.2d 561 (mem.). We have defined an issue as material if it might affect the legal outcome of a proceeding. N. Sec. Ins. Co., Inc. v. Rossitto, 171 Vt. 580, 581, 762 A.2d 861, 863 (2000).

¶ 30. This issue has morphed from its presentation in the Environmental Division to its presentation here. In the Environmental Division, it was about the measurement of the distance between the road and the house and the garage. The Environmental Division looked at the merits of the claims and ruled that "there [was] no conduct of [applicants] justifying even the consideration of awarding fees." Neighbor has apparently abandoned the arguments on which the court ruled.

¶ 31. As we held above, we will not consider claims that are not preserved in the trial court. See supra, ¶ 18. As we have also discussed above, neighbor's claims with respect to the wetland issue have never been properly presented either to the DRB or to the Environmental Division. In addition, the court accepted Mr. Wagner's explanation of what he presented to the

16

DRB with respect to the placement of the house in relation to the wetland. See supra, ¶ 21. Finally, neighbor still has the opportunity to contest the issuance of a state wetland permit to applicants. We cannot consider any claim that Mr. Wagner misrepresented facts with respect to the wetland boundaries in this appeal.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 32. **ROBINSON, J., concurring.** I concur with the majority's mandate and agree with its opinion except as to one point. I write separately because I believe that the majority opinion wrongly suggests that our application of a subdivision permit condition should be guided by the subjective intention of an individual who proposes a subdivision permit rather than the government body that actually issues the permit. See ante, ¶¶ 13-14.

¶ 33. The majority acknowledges that permit conditions are construed according to normal rules of statutory construction, with a focus on implementing the intent of the drafters. Ante, ¶ 12 (citing Agency of Nat. Res. v. Weston, 2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.)); see also Agency of Nat. Res. v. Handy Family Enters., 163 Vt. 476, 481, 660 A.2d 309, 312 (1995) ("We see no reason to depart from normal statutory construction techniques in interpreting permit conditions. We strive to implement the intent of the draftspersons."). But, then the majority asserts that the intent of a landowner who drafts a subdivision permit application, rather than that of the planning commission that actually approves the permit, is the operative intent of the drafters. See ante, ¶ 13 (explaining that because goal is to implement intent of draftspersons, intent of Mr. Wagner, who proposed the tree line condition as part of his

17

subdivision permit is operative); ante, ¶ 14 (describing Mr. Wagner's reasons for including tree line condition).

¶ 34. A subdivision permit reflects a governmental act, and the relevant intent is not that of the applicant for the permit, but rather the intent of the governmental body that issues the permit. To suggest otherwise would be like suggesting that the relevant legislative intent in construing a statute is the intent of the lobbyist who first offered the language for consideration, or the individual legislator who introduced a bill, rather than the legislative body that actually adopted that language. Cf. Cty. Soil & Water Conservation Dist. v. Wilson, 559 U.S. 280, 297-98 (2010) (concluding that letter written by primary sponsors of statute thirteen years after its enactment explaining their intent is of scant or no value); Trudell v. State, 2013 VT 18, ¶ 27, 193 Vt. 515, 71 A.3d 1235 ("Courts generally give little weight to an individual legislator's interpretation of the law once enacted because it cannot reflect the thought processes of the entire Legislature." (citing Barber v. Thomas, 560 U.S. 474, 485 (2010))); State v. Madison, 163 Vt. 360, 373-74, 658 A.2d 536, 545 (1995) (explaining that comments of individual legislators regarding their understanding of meaning of statute "are of little weight in determining legislative intent, unless they also exist in a written report that was available for review by the full legislature before passing the bill").

¶ 35. Any purpose or intention that Mr. Wagner actually conveyed to the Planning Commission when it reviewed his subdivision application may be relevant to discerning the Planning Commission's understanding and intent with respect to the meaning of the permit, and an assessment of the likely purpose behind a condition like the one at issue here may be a permissible consideration to the extent the plain language of the condition is ambiguous. But, what Mr. Wagner and his wife subjectively sought to accomplish relative to their view of the meadow, in and of itself, is not information that in any way advances our understanding of the

meaning of the tree line boundary on the plat plan.  I do not join the majority opinion on these points.

_____
Associate Justice