NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 106

Nos. 2016-273 & 2016-274

| | |
|---|---|
| In re Hinesburg Hannaford Act 250 Permit<br>In re Hinesburg Hannaford Site Plan Approval<br>(Mary Beth Bowman, et al., Appellants) | Supreme Court<br><br>On Appeal from<br>Superior Court,<br>Environmental Division<br><br>March Term, 2017 |

Thomas G. Walsh, J.

Allan R. Keyes of Ryan Smith & Carbine, LTD., Rutland, and James A. Dumont of Law Office of James A. Dumont, Esq., P.C., Bristol, for Appellants.

William H. Sorrell, Attorney General, and Kyle H. Landis-Marinello, Assistant Attorney General, Montpelier, for Appellee Vermont Natural Resources Board.

David W. Rugh of Stitzel, Page & Fletcher, P.C., Burlington, for Appellee/Cross-Appellant Town of Hinesburg.

Christopher D. Roy of Downs Rachlin Martin PLLC, Burlington, for Appellee/Cross-Appellant Martin's Foods of South Burlington, LLC.

PRESENT: Dooley, Skoglund, Robinson and Eaton, JJ., and Wesley, Supr. J. (Ret.), Specially Assigned

¶ 1. **ROBINSON, J.** These two consolidated appeals challenge the Environmental Division's decisions concerning applications for site-plan approval and an Act 250 permit for the proposed construction of a Hannaford's supermarket in the Town of Hinesburg. We affirm in part, reverse in part, and remand the matter for further proceedings consistent with this opinion.

¶ 2.     Appellee/cross-appellant Martin's Foods of South Burlington, LLC (Hannaford) proposes to construct a 36,000-square-foot grocery store and pharmacy with an adjacent 128-space parking lot on Lot 15 of the Commerce Park subdivision in Hinesburg.  Lot 15, over four acres in size, is the largest of the fifteen lots in the subdivision, for which municipal and Act 250 permits were originally granted in 1987.  The subdivision is located just north of the Hinesburg Village center within a triangular space formed by Route 116, Patrick Brook, and Mechanicsville Road. Route 116 runs north-south and is the main thoroughfare through Hinesburg.  Mechanicsville Road runs northeast from Route 116, from just south of the subdivision, to the east end of Commerce Street.  Commerce Street runs east-west parallel to Patrick Brook but within the subdivision north of Lot 15, connecting Route 116 and Mechanicsville Road to form the hypotenuse of the triangle in which most of the subdivision lies.  Commerce Street Extension runs a short distance off Commerce street south into the subdivision toward Lot 15.



**Section of June 2014 Route 116 Corridor Study Map**

¶ 3.     Lot 15, the last lot in the subdivision to be developed, is a four-sided irregularly-shaped lot bounded by existing development within the subdivision on two sides and by a canal and adjoining sidewalk running parallel to Mechanicsville Road.  The canal was constructed over a

2

century ago to provide water to a cheese factory. The relatively recently built sidewalk runs along the canal on the side opposite Mechanicsville Road. Vehicular access to the proposed project on Lot 15 would be by way of Commerce Street and then the Commerce Street Extension, which runs between existing developments located on the southern side of Commerce Street.



**General Plan Sheet from 1986 Subdivision Plat Plan**

¶ 4. The proposed project is a permitted use in the Town's Commercial Zoning District within the Hinesburg Village Growth Area and is subject to site plan review and conditional use approval under the Town's 2009 zoning regulations. Hannaford initially applied for site-plan and conditional use approval for the proposed project in November 2010. The Hinesburg Development Review Board (DRB) reviewed the application several times before the public hearing on the project was closed for the final time in October 2012. Following evidentiary hearings and site visits, the DRB approved the application with conditions in a written decision in November 2012.

3

Appellants/cross-appellees, a group of Hinesburg residents that oppose the project (Neighbors), appealed the DRB decision to the Environmental Division, and Hannaford cross-appealed.

¶ 5. In March 2013, Hannaford filed its Act 250 application with the District #4 Environmental Commission. Hannaford sought approval under all Act 250 criteria except Criterion 2, relating to the water supply, because the Town was in the process of upgrading its municipal well system and did not have available capacity to support the project at the time of the application. In June 2014, after conducting site visits and evidentiary hearings, the District Commission issued its initial merits decision concluding that the project, with specified conditions, satisfied each Act 250 criterion except Criterion 2. The District Commission issued an amended set of findings and conclusions on July 23, 2014. Neighbors appealed this decision to the Environmental Division.

¶ 6. The Environmental Division coordinated the site-plan and Act 250 appeals with other appeals relating to the project. After deciding a series of pretrial motions regarding a wide variety of issues, the trial court conducted a site visit and merits hearing from November 30 through December 2, 2015. The parties stipulated to submit direct testimony and related exhibits to the court in advance of the merits hearing through prefiled testimony. Cross-examination, re-direct examination, and rebuttal testimony were then presented live at the trial. Among the numerous matters contested at trial were issues relating to stormwater management, traffic, aesthetics, and public investment in the canal sidewalk.

¶ 7. In April 2016, the trial court issued separate 23-page and 60-page decisions with accompanying judgment orders, approving, respectively, Hannaford's site-plan and Act 250 applications with conditions. In response to multiple post-trial motions regarding both decisions, the court issued an amended Act 250 decision and indicated that it was making no changes to its

4

site-plan decision.[1]  Neighbors appealed both decisions, and Hannaford and the Town of Hinesburg cross-appealed both.  This Court consolidated the appeals for purposes of argument and decision.

¶ 8.     In challenging the trial court's site-plan approval, Neighbors argue that: (1) the trial court erred in declining to enforce a setback limit reflected in the final plat plan for the subdivision as approved in 1987; (2) Hannaford's site-plan application violated "front yard" parking restrictions set forth in the Town's 2009 zoning regulations; (3) the east-west swale proposed in the site-plan application will not control and treat stormwater as predicted by Hannaford's expert; and (4) Hannaford did not satisfy its burden regarding stormwater control because part of the discharge system is proposed to be located on land outside of its control.  In their cross-appeals, Hannaford and the Town challenge the trial court's condition requiring Hannaford to install a traffic signal at the intersection of Route 116 and Mechanicsville Road before the project may be completed, and the Town challenges the court's elimination in its amended decision of a condition requiring Hannaford to perform a post-development traffic study.

¶ 9.     In challenging the trial court's Act 250 decision, Neighbors argue that: (1) the trial court erred in declining to enforce a provision in the original approved Act 250 master subdivision permit that development in the subdivision would be "small scale"; (2) the trial court improperly focused on the foreseeability of a commercial development on Lot 15 in determining whether the proposed project would materially interfere with the public's use and enjoyment of the canal path; and (3) Hannaford failed to dispute the uncontradicted testimony of Neighbors' expert that the east-west swale would not function as claimed because of the area's saturated soils.  As in their site-plan cross-appeals, Hannaford and the Town reiterate their opposition to a condition requiring a traffic

---

[1] The Town argues that although the trial court indicated it was not amending its initial site-plan decision, it simultaneously suggested that it was eliminating the condition in that initial order that Hannaford perform a post-development traffic study.  Because we reverse the site-plan determination on other grounds, we do not resolve the confusion concerning the effect of the trial court's site-plan decision on the post-development traffic-study condition.

signal at the Route 116/Mechanicsville Road intersection. The Town also challenges the trial court's decision on reconsideration to eliminate the post-development traffic study requirement. The Natural Resources Board (NRB) has filed a brief in the Act 250 appeal asking this Court to uphold the condition that a traffic signal be placed at the Route 116/Mechanicsville Road intersection prior to operation of the proposed project.

¶ 10. For the reasons stated below, we conclude, with respect to the site-plan appeal, that Hannaford's proposed site plan violates the setback limit in the final plat plan approved in 1987. We conclude that Hannaford's parking scheme does not violate the site-plan approval standards in the applicable zoning regulations. We need not reach the issues raised in that appeal concerning the east-west swale and traffic control. Accordingly, we reverse the Environmental Division's approval of the site plan.

¶ 11. Regarding the Act 250 appeal, we conclude that the project does not violate a requirement in the original approved subdivision permit that development be primarily "small scale," and that the proposed project would not materially interfere with the public's use and enjoyment of the canal path. We remand for further development of evidence concerning the east-west swale and traffic issues. Accordingly, we reverse the Environmental Division's approval of the Act 250 permit and remand the matter for further consideration.

I. Standard of Review

¶ 12. Our general standard of review is not in doubt.[2] "We will defer to the court's factual findings and uphold them unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." In re Wagner & Guay Permit, 2016 VT 96, ¶ 9, ___ Vt. ___, 153 A.3d 539 (quotation omitted). This is so because "the environmental court determines the credibility of

_____

[2] We discuss more fully below, in the context of our analysis of the trial court's site-plan approval, our standard of review with respect to the trial court's construction of municipal zoning regulations.

6

witnesses and weighs the persuasive effect of evidence." In re Champlain Parkway Act 250 Permit, 2015 VT 105, ¶ 10, 200 Vt. 158, 129 A.3d 670. We review the court's legal conclusions without deference, but "we will uphold those conclusions if they are reasonably supported by the findings." Wagner & Guay Permit, 2016 VT 96, ¶ 9.

## II. Site-Plan Appeal

### A. Review of Zoning Regulations and Permit Conditions

¶ 13. The parties disagree about whether this Court owes any deference to the Environmental Division's interpretation of the Town's zoning ordinance. Neighbors contend that the interpretation of a zoning ordinance presents a legal issue that we review without deference to the Environmental Division, while Hannaford asserts that the deference we give to the Environmental Division with respect to findings of fact extends to its interpretation of zoning ordinances. We need not resolve this dispute in this appeal because our resolution of the issues raised by the parties would be the same under either proposed standard of review.

### B. Setback Limits

¶ 14. On appeal from the DRB to the Environmental Division, Neighbors argued that Hannaford's site plan violated a setback condition of the 1987 subdivision approval and that Hannaford had not sought a permit amendment from the Town. Specifically, Neighbors asserted that the proposed project violates a setback, reflected in the 1986 final approved plat plan for the subdivision, that is seventy-five feet from the canal running parallel to the southern side of the subdivision. In response, Hannaford asserted that: (1) the court was without jurisdiction to consider whether a subdivision permit amendment was required because it had not sought a permit amendment from the Town; and (2) in any event, the building setbacks depicted on the plat plan accompanying the 1987 subdivision approval did not establish enforceable conditions because they are unclear and had not been enforced by the Town with respect to other permitted projects within the subdivision.

7

¶ 15. The trial court acknowledged that it had no jurisdiction to consider whether the 1987 subdivision approval should be amended, given that Hannaford had not sought a permit amendment from the Town. The court determined, however, that although in 1987 the Town planning commission approved the subdivision as depicted on the final plat plan accompanying the subdivision application, the plat plan did not establish enforceable setbacks because: (1) the narrative in the planning commission's written decision approving the subdivision did not discuss or establish any required setbacks for lots within the subdivision; (2) although the plat plan includes a legend indicating various types of lines depicting setbacks, boundaries, waterways, and roads, it has no inscriptions or notes—other than a notation indicating a one-inch-per-100-foot scale—identifying any measured distances between the lines; and (3) the plat plan does not have an accompanying document indicating an intent to impose a setback restriction. Relying on a recent decision by this Court, the trial court concluded that the distances between the various lines on the 1986 plat plan were not "sufficiently clear to constitute land-use restrictions." In re Willowell Found. Conditional Use Certificate of Occupancy, 2016 VT 12, ¶ 15, 201 Vt. 242, 140 A.3d 179.

¶ 16. On appeal to this Court, Neighbors argue that the trial court erred by concluding that the seventy-five-foot building setback limit in the final approved plat plan for the original subdivision application was unenforceable.[3] According to Neighbors, the recorded plat unambiguously provided reasonable notice of the setback requirement and, even assuming the plat plan was ambiguous as to the setback requirement, the fact that the Town may have approved buildings within the subdivision that violated the setback requirement, whether intentional or not, was not persuasive evidence of the planning commission's intent when it approved the subdivision. For its part, Hannaford argues that the scant reference to setback lines on the general plan sheet of

---

[3] Neighbors' argument that the trial court erred in allowing Hannaford to collaterally attack the unappealed 1987 plat approval, in violation of 24 V.S.A. § 4472(d), misses the central issue. Hannaford is not seeking to set aside a condition of the plat approval; the issue in this case is whether that 1987 approval created an enforceable setback condition in the first place.

8

the plat was insufficient to establish an enforceable permit condition, as evidenced by the fact that no such setback limit has been enforced in the three decades since the subdivision was approved.

¶ 17. The applicable legal standard is well established: if the approved plat plan clearly includes the claimed seventy-five-foot setback, that setback is an enforceable condition. We have recently reiterated that, because the function of a subdivision permit is to approve plats of land, "recorded plats necessarily become subdivision permit conditions." Wagner & Guay Permit, 2016 VT 96, ¶ 13 (quotation omitted); see also In re Stowe Club Highlands, 164 Vt. 272, 276, 668 A.2d 1271, 1275 (1995) ("[A]lthough we will not recognize implied permit conditions as subdivision permits, recorded plats necessarily become subdivision permit conditions."). To be enforceable, subdivision permit conditions "must be specific enough to provide a landowner with notice that his or her property rights are fettered." Willowell, 2016 VT 12, ¶¶ 15, 18 (stating that "restrictions should be explicit to provide notice of all conditions imposed because [otherwise] 'subsequent purchasers would lack notice of all restrictions running with the property' " (quoting In re Kostenblatt, 161 Vt. 292, 298, 640 A.2d 39, 43 (1994))). "A violation of a condition of a subdivision permit would be a violation of the zoning ordinance itself." In re Robinson, 156 Vt. 199, 202, 591 A.2d 61, 62 (1991).

¶ 18. In this case, the building setback on the approved and recorded subdivision plat is clear and unambiguous. The Hinesburg Planning Commission's final plat approval for the subdivision specifically incorporates by reference the plan prepared by Phelps Engineering, dated September 9, 1986. The legend prominently displayed on the title sheet of that approved plat plan indicates several types of lines, one of which represents "BUILDING SETBACK LIMITS." In the general approved plan, there is nothing unclear about the corresponding building setback line on lot 15. A scale of one inch for every 100 feet is indicated on the general plan sheet of the plat. Measured

to scale, the setback limit from the canal indicated on the general plan sheet is seventy-five feet.[4] The plat plan and subdivision approval were recorded in the town clerk's office.

¶ 19.    The above undisputed facts demonstrate the existence of subdivision setback limits explicit enough to provide clear notice of an enforceable condition, notwithstanding the various claimed bases for finding ambiguity.  The fact that the general plat plan relies on the clear setback lines and the notated scale of the plat plan, rather than explicitly noting that the distance between the canal and the setback line is seventy-five feet, does not negate that clarity.  There is no dispute that the approved plat plan, measured to scale, depicts a seventy-five-foot setback from the canal.  Nor is there ambiguity because the building setback limits are not reproduced in the more detailed pages of the plat plan depicting septic and stormwater plans; in contrast to the general plan depicted in the approved plat, those pages are focused narrowly on the septic and stormwater issues.

¶ 20.    Likewise, the fact that buildings in the subdivision have been built within the setback limits depicted in the recorded plat plan does not change the fact that the plat plan as approved explicitly establishes the setbacks.  For one thing, we have no occasion to consider this extrinsic evidence where the requirements of the approved plat plan are clear and unambiguous.  Cf. Wagner & Guay Permit, 2016 VT 96, ¶¶ 11, 13 (noting that permit condition in approved plat plan is reviewed "according to normal rules of statutory construction" and considering extrinsic evidence in construing ambiguous notation on plat plan).  Moreover, the parties stipulated that the permits for those other buildings were unchallenged, and there was no evidence, other than the fact that some

---

[4] Notably, this seventy-five-foot setback matches a condition in the approved Act 250 permit issued to the applicant in March 1987.  If we concluded that the seventy-five-foot setback was ambiguous, this fact might be relevant to our examination of the extrinsic evidence, reinforcing our interpretation of the setback requirement in the municipal subdivision approval.  Because we find the setback clear and unambiguous on its face, we need not resort to extrinsic evidence.  See City of Newport v. Vill. of Derby Ctr., 2014 VT 108, ¶ 14, 197 Vt. 560, 109 A.3d 412 (stating that where parties' intent as expressed in writing is unambiguous, there is no need to consider "the parties' arguments regarding extrinsic evidence of the parties' intent").

buildings were built within the setback limits, that the Town considered the setback limits to be unenforceable.

¶ 21. Hannaford's reliance on Willowell is unavailing. That case concerned two undefined phrases used on the subdivision plat plan—"Agricultural Reserve" and "Building Envelope." The neighbors opposing the proposed project argued that the phrases were sufficiently explicit to impose conditions setting aside land for agricultural use and restricting new buildings to certain areas. We upheld the Environmental Division's conclusion that the two two-word phrases, in the absence of any definitions conveying the meaning the parties sought to ascribe to those phrases, were too ambiguous to impose enforceable permit conditions. Willowell, 2016 VT 12, ¶¶ 19-20. In contrast, the significance of the line demarcating a "building setback" in this case requires no further elucidation; the meaning of "building setback" is well understood. See, e.g., Setback, Black's Law Dictionary (10th ed. 2014) (defining "setback" as "[t]he minimum amount of space required between a lot line and a building line"). Accordingly, we reverse the Environmental Division's conclusion that the setback limit was not an enforceable condition.

¶ 22. Given that the setback requirement in the master subdivision permit is enforceable, no party disputes that the proposed site plan violates the condition. The trial court found that at their closest points, the edge of the building will be about sixty-five feet from the canal and that the overhang of the roof will measure about forty-two feet from the edge of the canal. No party challenges this finding. Thus, we reverse the court's issuance of the site plan permit.

C. Front Yard Parking

¶ 23. Notwithstanding our reversal of the site-plan approval on the setback issue, we address the front-yard-parking issue because, unlike the other issues in the site-plan appeal,[5] it is

---

[5] We do not assume that the evidence presented at a new site-plan hearing would present the same issues concerning the east-west swale, stormwater control, and traffic issues, and accordingly do not address those issues here.

11

likely to reoccur in the context of a new application for site-plan approval, regardless of whether Hannaford amends its site plan or obtains a setback amendment. See In re Taft Corners Assocs., Inc., 160 Vt. 583, 593, 632 A.2d 649, 654-55 (1993) (in interest of judicial economy, court may reach issues likely to occur on remand). Although we are not actually remanding the site plan matter, it would not make sense to force Hannaford to redesign its project in connection with a new application for site plan approval, if it chooses to do so, with continued uncertainty as to the effect of the front-yard restriction on parking.

¶ 24. Neighbors argued below that the parking proposed in Hannaford's site-plan application violates the Town's zoning regulations limiting "front yard" parking. The trial court determined that the applicable regulations do not prohibit the parking proposed in the site plan based on its conclusion that, pursuant to the definitions in those regulations, the front yard of the proposed project is the side of the building facing roughly south parallel to Mechanicsville Road. We uphold the trial court's determination for the reasons stated below.

¶ 25. The zoning regulations require the DRB "to take into consideration" standards specified therein, including conformance with § 5.6 of the regulations, "where [it] applies." Town of Hinesburg Zoning Regulations, § 4.34(9). Section 5.6.3 of the zoning regulations, in relevant part, provides as follows:

> **Parking and loading areas:** Parking and loading areas for any new structures shall be located in the side or rear yards of the structure. Where sufficient screening is provided, and with Development Review Board approval, up to 20% of the total number of parking spaces may be located in the front yard of the structure.

The regulations define front, side, and rear yards as follows:

> Yard, Front: A yard on the same lot with a principal building, extending the full width of the lot and situated between the centerline of the street or right-of-way and the front line of the building extending to the side lines of the lot.

> Yard, Side: A yard situated between the principal building and a side line and extending from the front yard to the rear yard. The distance

12

between the principal building and the side line shall be measured from the building to the nearest point on the side line along a line parallel to the front lot line.

Yard, Rear: A yard on the same lot with a principal building between the rear line of the building and the rear line of the lot extending the full length of the lot. No lot shall have more than 1 rear yard with regard to setback requirements. For lots with multiple front yards, the rear yard shall be opposite the front yard that provides the primary access to the lot.

¶ 26. The regulations do not define the phrase "front line of the building" contained in the definition of "front yard." Hannaford's site plan proposes 128 parking spaces, most of which are located on the sides of the proposed building facing roughly north and east and parallel to Commerce Street as it arcs from Route 116 to Mechanicsville Road. Neighbors argue that the front yard must be in front of the east-facing side of the building, where more than half of the proposed parking spaces are located, because: (1) consistent with common English usage, the front line of a grocery store is the side that contains the public entrance and the store's name, which in this case is the east wall of the building; and (2) the rear yard must be the area in front of the south-facing wall of the building located parallel to Mechanicsville Road because there are multiple front yards in front of the north and east walls running parallel to the arcing Commerce Street, which provides the only vehicle access to parking via the Commerce Street extension.

¶ 27. We note at the outset that the front yard parking restrictions and the corresponding definitions of "front," "side," and "rear" yards in the municipal ordinance cannot be neatly applied to this lot and this project for several reasons. First, a narrow right-of-way provides access from Commerce Street to Lot 15; the lot has no frontage on Commerce Street itself. Second, the lot abuts Mechanicsville Road, but is not accessible from that road. Third, the shape of this lot, the orientation of the building on the lot, and the fact that Commerce Street and Mechanicsville Road are not parallel but in fact converge beyond the northeasterly boundary of Lot 15, make it difficult to apply the definitions in the ordinance. The irregular shape of the lot does not exempt it from the requirements

13

of an otherwise clear zoning ordinance, <u>Bennett v. Zelinsky</u>, 878 A.2d 670, 678 (Md. Ct. Spec. App. 2005), but the shape does make it more difficult to construe and apply unclear requirements. To the extent that the touchstone in the definition of "front yard" is the "centerline of the street or right of way," there are two streets potentially in play: Commerce Street, which provides access to Lot 15 but is separated from that lot by other lots and buildings, and Mechanicsville Road, which is significantly closer to the building and parking lot, but does not provide road access to Lot 15. And because of its arcing course, the centerline of Commerce Street itself is roughly parallel to two different sides of the proposed building at two different points on Commerce Street. We recognize that the definition of "rear yard" contemplates the possibility of more than one front yard, but we do not believe the parking restriction, which provides for parking in the side or rear yards, and limited parking in the front yard, purports to limit parking on three sides of this building.

¶ 28.    Instead, we conclude that the regulation restricting front yard parking evinces the Town's preference for placing commercial buildings closer to streets, with parking in back, rather than having large parking areas located between streets and buildings. In this case, the proposed building adjoins Mechanicsville Road and is accessed from Commerce Street. The only yard that is situated immediately between the centerline of a road and a wall of the proposed building is the one facing Mechanicsville Road. In contrast, Lot 15 and Commerce Street are separated by several developed properties. Nothing in the text of the parking ordinance requires that the front yard be defined with reference to the road from which the building is accessed. In this case the purpose of the parking regulation would not be furthered by labeling the north and east walls of the proposed building as front yards.

¶ 29.    We likewise reject Neighbors' suggestion that the location of the front yard turns on the orientation of the building entrance. To the extent the ordinance defines "front yard" at all, it does so with reference to adjoining streets rather than the main entrance of the building. Although the ordinance may reflect an assumption that in most cases the main entrance to a business will face

14

a road, nothing in the ordinance requires that. Accordingly, we reject Neighbors' argument that the proposed site plan violates the Town's parking regulations.

## III. Act 250 Appeal

### A. "Small Scale" Development

¶ 30. We affirm the Environmental Division's conclusion that the project does not run afoul of a requirement of the Act 250 master subdivision permit that development in the subdivision be "small scale."

¶ 31. The original Act 250 permit application included a project narrative with a three-paragraph general description and a preliminary outline addressing the Act 250 criteria. The third paragraph of the general description states as follows:

> The subdivision is designed as a "Commercial Industrial Park" intended for primarily local small scale and start-up businesses which are appropriate to the local scale of development. Certain lots will be designated for uses appropriate to their location on the site. Lot sizes range from 1 to 3 acres though it is expected that in some cases more than one lot may be combined. Businesses expected to locate in the project might range from "High-Tech" research and development firms supporting other Chittenden County industries to retail outlets for local agricultural or manufactured products.

The 1987 Act 250 permit requires the permittees and their successors to complete, maintain, and operate the project in accordance with the plans and exhibits stamped "Approved" and on file with the District Environmental Commission. The application containing the project narrative noted above is among the plans and exhibits thereby incorporated by reference into the 1987 Act 250 permit.

¶ 32. The Environmental Division rejected Neighbors' argument that the reference to "small scale" in the project narrative of the original permit application should be considered a permit condition. The court ruled that reference to small-scale businesses offered "a generalized aspirational goal that by its terms is not a prerequisite for development." In the court's view,

15

although "the goal that the subdivision should <u>primarily</u> be comprised of small-scale local businesses may be commendable, it does not provide an express permit condition."

¶ 33.     On appeal, Neighbors argue that the statement in the approved project narrative indicating that the subdivision would be comprised primarily of small-scale businesses is an enforceable permit condition that was expressly incorporated by reference into the 1987 Act 250 permit.

¶ 34.     We conclude that, even assuming the general project description in the approved project narrative may be an enforceable part of the permit condition, the project does not run afoul of a specific and enforceable requirement that all projects in the subdivision be "small scale." We reach this conclusion for several reasons. The project narrative does not require that development within the subdivision be exclusively small-scale development. It contemplates that the subdivision will consist "primarily" of local small-scale and start-up businesses. This qualifier suggests an expectation that the project may well include some development that does not fit that description. Notably, the proposed project is situated in the lot that is by far the biggest of the subdivision, and thus the most likely site for a larger business.   Similarly, the general description of the kinds of businesses expected to locate in the project indicates that they "might range" from certain kinds of high-tech research and development firms to retail outlets for local agriculture or manufactured products. The description does not purport to limit development to those particular types of businesses.

¶ 35.     Finally, the approved permit nowhere defines "small scale" development. It does, however, include objective metrics regulating the number of parking spaces, gallons per day of water and wastewater, daily and peak-hour vehicle trips, and electricity usage. We infer that the District Commission relied on these more specific limitations to regulate the scale of development in the subdivision and did not intend the statement that the "Commercial Industrial Park" was "primarily" for "local small scale and start-up businesses" to be an independent qualitative restriction on

16

development in the subdivision. See Sec'y, Vt. Agency of Nat. Res. v. Handy., 163 Vt. 476, 482, 660 A.2d 309, 312-13 (1995) (stating that Act 250 permit conditions "must be expressed with sufficient clarity to give notice of the limitations on the use of the land" (quotation omitted)).

¶ 36. Neighbors' reliance on In re Duncan, 155 Vt. 402, 584 A.2d 1140 (1990), and In re Denio, 158 Vt. 230, 608 A.2d 1166 (1992), is misplaced. In Duncan, the neighbors appealing a zoning permit for a homeless shelter argued, in relevant part, that the trial court's order was not sufficiently specific to establish operating rules for the shelter. The trial court's order generally described the proposal and approved the application pursuant to the plans and specifications admitted into evidence. This Court understood the trial court's order to mean that it was approving the project as proposed by the applicant and concluded that the order was "sufficiently specific to ascertain what has been approved." Duncan, 155 Vt. at 410, 584 A.2d at 1145. In Denio, the applicants challenged a permit condition requiring them "to complete the project consistent with the Board's findings and conclusions and the approved plans and exhibits," arguing that the condition "create[d] an unreasonable restriction on their title because of the inability to easily follow the findings, conclusions and plans and because they are vague." 158 Vt. at 241, 608 A.2d at 1172. We rejected that argument, noting that permits, including their conditions, must be recorded in land records, and that "[p]ersons coming upon this permit will know that they have to also look at the findings, conclusions and plans." Id. These cases do not undermine our conclusion that the term "small scale," in the broader context of this subdivision project narrative, did not constitute an independent limitation on development in the subdivision.

B. Public's Use and Enjoyment of Canal Path

¶ 37. We affirm the Environmental Division's conclusion that the proposed project did not materially jeopardize or interfere with the public's use or enjoyment of the path that runs along the canal near the Mechanicsville Road side of Lot 15, in violation of Act 250 Criterion 9(K).

¶ 38. In relevant part, Criterion 9(K) provides that:

17

A permit will be granted for the development or subdivision of lands adjacent to governmental and public utility facilities, services, and lands, . . . when it is demonstrated that, in addition to all other applicable criteria, the development or subdivision will not unnecessarily or unreasonably endanger the public or quasi-public investment in the facility, service, or lands, or materially jeopardize or interfere with the function, efficiency, or safety of, or the public's use or enjoyment of or access to the facility, service, or lands.

10 V.S.A. § 6086(a)(9)(K).

¶ 39.  In the 1990s, the Town of Hinesburg received over $100,000 in federal and state funds for the Hinesburg Streetscape Project to improve sidewalk infrastructure, to construct a paved walkway along the canal, and to install a footbridge near the southwestern corner of Lot 15. The canal path was built on an easement within the subdivision. Neighbors argued before the Environmental Division that the proposed project would unnecessarily or unreasonably endanger the public investment in the canal path and would materially jeopardize or interfere with the function, safety, and the public's use and enjoyment of the path and associated facilities.

¶ 40.  The trial court concluded that the project would not increase the cost of maintaining the path or interfere with public access to the path. It also rejected Neighbors' assertion that the project would materially interfere with the public's use and enjoyment of the path because users of the path would see the side of a store building and a parking lot instead of an undeveloped field. The court recognized that the view from the canal path might be less scenic after the development of Lot 15, but noted that Lot 15 is one lot within a commercial development established before the canal path was built and that, although pedestrians on the path currently view an open field on Lot 15, there are multiple commercial buildings immediately beyond the open field. The court rejected Neighbors' argument on the grounds that the canal path is located in a commercial setting and was constructed "with the full understanding that commercial development would likely occur in the immediate vicinity" of the path and that the proposed project calls for substantial landscaping and

18

screening along the path as well as a nonstandard building designed by a local architecture firm to be compatible with its surroundings.

¶ 41. In a motion to alter or amend the judgment, Neighbors argued, among other things, that the court had erroneously considered the foreseeability of a commercial development on Lot 15 in determining whether the proposed project materially interfered with the public's use and enjoyment of the canal path. In response, the court agreed that Criterion 9(K) could be violated in instances where future development was possible, but concluded that, in considering whether a development materially interfered with the use and enjoyment of a public facility, it could not ignore that development on Lot 15 was predictable at the time of the public investment in the path.

¶ 42. On appeal, Neighbors argue that the trial court misapplied Criterion 9(K) by considering the foreseeability of commercial development on Lot 15 and that, in any event, the court erred in concluding that a commercial development of the scale and intrusiveness of the proposed project was foreseeable to public officials who developed the canal path. Regarding the first part of this argument, Neighbors acknowledge that the foreseeability of the development on Lot 15 was only part of the court's rationale in rejecting their Criterion 9(K) argument, but they contend that, as a matter of law, foreseeability is not part of the analysis under Criterion 9(K) and that we cannot determine how the court would have ruled had it not relied upon this impermissible factor. According to Neighbors, the court read Criterion 9(K) as if it included the words "unforeseeably or unduly" before the word "interfere" and, as a result, did not consider whether the actual impact of the proposed project on the canal path was material and entitled to protection.

¶ 43. While we agree that foreseeability per se is not a component of the analysis under Criterion 9(K), we do not agree that the court failed to address the materiality of the alleged interference with the public's use and enjoyment of the path. The distinction in this case is subtle. The gist of the court's decision, when read in its entirety, is that the proposed project would not materially interfere with the public's use and enjoyment of the canal path because of the commercial

19

setting of the path and the "substantial landscaping and screening along the path." Cf. In re McShinsky, 153 Vt. 586, 593, 572 A.2d 916, 921 (1990) (upholding Environmental Board's conclusion that applicants' proposed RV campground would interfere with public's use and enjoyment of river extensively used for various recreational pursuits). In short, in concluding that the proposed project would not materially interfere with the public's use and enjoyment of the canal path, the court considered the context of the public investment—a paved walkway on an easement along a commercial development and a former industrial canal. The court did not err in doing so.

¶ 44. Nor do we find persuasive Neighbors' contention that, even assuming the Environmental Division could properly consider the foreseeability of the development, the scale and intrusiveness of the proposed project was not foreseeable. As noted above, the foreseeability of the scope of the particular proposed project is not the legally determinative factor. Nonetheless, the location of the canal path near the fringes of a "Commercial Industrial Park" with existing and planned commercial development is a significant fact for consideration in the analysis. In determining whether the proposed project would materially interfere with the use and enjoyment of the canal path, the court assessed the current and proposed views from the canal path, noting in particular that Hannaford had proposed to spend substantial sums for landscaping and screening, including significant amounts directed specifically at the canal path, and had hired a local architecture firm to design a nonstandard building that would be compatible with its surroundings. These findings and conclusions support the court's decision regarding Criterion 9(K).

C. Grass Stormwater Swale

¶ 45. We agree with Neighbors that the Environmental Division failed to address the evidence and make findings on whether the proposed stormwater grass swale would function properly, and instead relied upon assumptions and subsequent enforcement to satisfy Act 250 water quality criteria.

20

¶ 46. The proposed project includes a stormwater management system designed to accommodate stormwater runoff from the 2.88 acres of impervious surface that would result from the project. The system is designed to collect stormwater through a series of catch basins and convey the water for on-site treatment and detention, with eventual discharge into a nearby brook through a detention pond and outlet structure located between Lots 2 and 3 of the subdivision. During the proceedings before the Environmental Division, Hannaford modified its stormwater design by relocating its proposed grass stormwater swale entirely within Lot 15, running in an east-west direction. Because the relocated swale had not been approved by the Agency of Natural Resources (ANR), there was no presumption of compliance with Act 250.

¶ 47. The purpose of the swale is to treat stormwater and provide for groundwater recharge, in part, by detaining water for an expected period of time. At a December 1, 2015 hearing, Hannaford's expert, a civil engineer, testified that "we've designed a system that we think meets the rules" and, more specifically, that the east-west grass stormwater swale was designed "to meet the water quality and the recharge requirements of the rules." The expert explained that the 210-foot-long grass swale would have an eight-foot-wide dipped bottom to handle storm events as required by the ANR rules. The expert acknowledged that Hannaford would have to demonstrate that the swale would be able to handle the water flow coming from its property and other properties as indicated in its design.

¶ 48. On the same hearing date, Neighbors' expert, also a civil engineer, summarized his prefiled testimony by opining that the relocated grass stormwater swale was "unlikely to function as planned" because it was located in an area that was regularly inundated with water. The expert stated that each time he had visited the site he noticed tall grass and cattails growing in saturated ground and that just the previous day the area was ponded up to six inches deep. He "fully expect[ed] the channel to be saturated after construction, and instead of being a groundwater discharge feature, in addition to a water quality treatment feature, it will likely take in groundwater" such that

21

"groundwater will infiltrate into the channel, rather than exfiltrate out of the channel." Consequently, the expert explained, the channel would be a perennially wet breeding ground for mosquitoes and occupied by wetland plants that would not permit it to meet the functional requirements of a grass channel for purposes of water quality treatment. Hannaford's expert did not respond to this testimony.

¶ 49. In considering whether the proposed project met Act 250 water quality standards as set forth in Criterion 1 of 10 V.S.A. § 6086(a), the trial court stated that the east-west stormwater swale was "designed according to ANR's specifications and functional requirements" and that Neighbors' arguments were insufficient to establish that the swale would not function as proposed. Addressing Neighbors' claim that stagnant water would always be present in the grass swale, the court stated that Hannaford "propose[d] to construct a grass treatment swale according to ANR's standards," and "[a]s proposed, the swale will not have standing water and will pose no risk to human health." The court stated further that "[i]f, post-development, the grass swale does not function properly, [Hannaford] will be obligated to remedy the issue." In response to Neighbors' argument in their motion to amend that they presented uncontradicted evidence that the east-west grass stormwater swale would not function properly, the court stated that it had made a "credibility determination between two or more opposing expert opinions" and that its approval was based on Hannaford's "evidence and representations, and, therefore, to comply with its permit, [Hannaford] must install and operate a grass swale that conforms to the evidence presented."

¶ 50. On appeal, Neighbors argue that the trial court failed to evaluate their expert's uncontradicted testimony that the proposed grass stormwater swale would not function as claimed. According to Neighbors, the court's approval of the system was not based on findings and conclusions as to whether the system will actually function as claimed; rather, the court relied upon unsupported assumptions that were undermined by uncontradicted expert testimony and inappropriately deferred to future enforcement procedures for compliance.

22

¶ 51. We agree. The Environmental Division may rely upon modeling in determining the likelihood of a system meeting Act 250 criteria. Moreover, it has "broad discretion to assess the credibility of the witnesses and the persuasive value of the evidence." In re Costco Stormwater Discharge Permit, 2016 VT 86, ¶ 14, ___ Vt. ___, 151 A.3d 320. But these principles are not controlling in this case. Hannaford had the burden of proving compliance with Criterion 1. 10 V.S.A. § 6088(a). To that end, Hannaford's expert testified simply that the relocated stormwater swale was designed to meet the applicable ANR standards—a conclusory assertion that acknowledged the governing standards. The expert did not testify that the system would likely work as designed. Nor did he address the uncontradicted testimony of Neighbors' expert that the swale would not function as designed and thus would not meet those standards for very specific reasons— the area was perennially wet, saturated with water, and populated by wetlands plants that would not hold water as designed. The trial court made no findings or conclusions regarding the uncontradicted testimony of Neighbor's expert, but instead summarily stated that, "[a]s proposed," the swale would not have standing water and thus would comply with the applicable standards, and, if it did not, Hannaford would be obligated to remedy the situation in enforcement proceedings. The finding that the swale would not have any standing water was not supported by any testimony.

¶ 52. In short, in the face of specific unchallenged evidence that the system would not work as intended, the court relied upon Hannaford's conclusory representations that the system was designed according to governing standards, without making any findings or conclusions regarding the contrary evidence, and without any testimony addressing the likely effectiveness of the system. That was error. The court was required to "make affirmative findings under all ten statutory criteria before issuing a permit." In re Treetop Dev. Co., 2016 VT 20, ¶ 11, 201 Vt. 532, 143 A.3d 1086; see In re SP Land Co., 2011 VT 104, ¶ 25, 190 Vt. 418, 35 A.3d 1007 (stating that Act 250 rules "mandate[] that a permit may issue only when positive findings of fact and conclusions of law have been made under all criteria" before issuing permit). And the court's findings must be supported by

23

competent evidence. See Trombly Plumbing & Heating v. Quinn, 2011 VT 70, ¶ 10, 190 Vt. 552, 25 A.3d 565 (mem.) ("The trial court's findings will stand if there is reasonable and credible evidence to support them."). In light of the uncontradicted evidence presented by Neighbor's expert, the court was obligated to make findings and conclusions on the functionality of the proposed relocated swale and not rely solely on Hannaford's expectation that the swale would meet the applicable standards and on an inference that it would actually work.

¶ 53. In the absence of evidence that the proposed swale would likely work as intended, the court's reliance on enforcement proceedings to assure the functionality of the swale would shift to those proceedings questions that should be addressed at the permitting stage. That would significantly impact Neighbors' rights. Although interested parties may participate in enforcement proceedings, they have no right "to initiate such proceedings or raise additional violations." Treetop, 2016 VT 20, ¶ 13 n.4; see 10 V.S.A. § 6027(g) (assigning to NRB discretion to initiate enforcement on matters related to land use permits). Thus, the trial court's reliance on enforcement proceedings, in the absence of evidence supporting the trial court's finding that the swale would likely work, deprives Neighbors of their only certain opportunity to present evidence demonstrating that the system would not function as designed because of the particularities of its location.

¶ 54. Accordingly, the matter must be remanded for the trial court to make findings and conclusions on the functionality of the swale in its proposed location, assuming that Hannaford does not submit a revised stormwater design. The court may take additional evidence on this question.

### D. Cross-Appeals—Traffic Issues

¶ 55. The traffic issues on appeal relate to two proposed conditions—one ordered by the trial court and one declined by the trial court—designed to mitigate traffic congestion and safety issues arising from the project. Criterion 5 of Act 250 requires that a development "not cause unreasonable congestion or unsafe conditions with respect to use of the highways." 10 V.S.A. § 6086(a)(5). An Act 250 permit may not be denied solely for reasons set forth in § 6086(a)(5), but

24

"reasonable conditions" may be imposed "to alleviate the burdens created." Id. § 6087(b). The party opposing the applicant has the ultimate burden of persuasion with respect to Criterion 5, id. § 6088(b), but the applicant has the initial burden of production regarding that criterion, see Champlain Parkway, 2015 VT 105, ¶ 15.

¶ 56. When a proposed development will exacerbate already unreasonable congestion or unsafe conditions, courts must decide on a case-by-case basis whether to impose mitigating conditions and which conditions to impose. Compare In re Pilgrim P'ship, 153 Vt. 594, 595-98, 572 A.2d 909, 910-11 (1990) (noting that Criterion 5 "does not require that proposed development be the principal cause or original source of traffic problems" and upholding Environmental Board's determination that development did not meet Criterion 5 based on evidence that project would result in five-percent increase in traffic in area that was already "unreasonably congested and unsafe") with Costco Stormwater Discharge Permit, 2016 VT 86, ¶¶ 16-17 (affirming trial court's determination that near-term mitigation measures were sufficient to mitigate project's contribution to existing congestion where project would increase traffic at already congested intersection).

¶ 57. In this case, there was no dispute that the project would exacerbate existing congestion. Based on testimony from Hannaford's own expert, the trial court found that the project would generate 386 end trips per hour during the weekday evening commute hour, which is the peak hour. The trial court found that even without these added trips from the project, several areas near and along Route 116 currently see significant traffic congestion and delays and several high crash locations (HCLs) have been identified within the project impact area, including three between the area just north of the Commerce Street intersection and the Charlotte Road intersection.[6] The Vermont Agency of Transportation (VTrans) measures traffic congestion and traffic delays at high-traffic times through a level-of-service (LOS) rating system that assigns grades from A to F, with F

---

[6] An HCL indicates five or more accidents over a five-year period within a 0.3-mile stretch of road.

being the worst. The trial court found that even without the project, the Route 116/Mechanicsville Road intersection and the Route 116/Charlotte Road intersection, south of Mechanicsville Road, are LOS F. The court concluded that with many of these intersections already experiencing congestion and safety concerns without the project, the addition of 386 peak-hour trips in the early evening would "certainly exacerbate existing conditions." On appeal, nobody challenges this conclusion.

¶ 58. At issue in this appeal are the necessity and reasonableness of two proposed conditions: one requiring the installation of a traffic light at the intersection of Route 116 and Mechanicsville Road, and one calling for a post-approval traffic study of the southbound left-turn lane on Route 116 at the Commerce Street intersection.

### 1. Traffic Signal at Route 116/Mechanicsville Road Intersection

¶ 59. We conclude that the record does not support the Environmental Division's requirement conditioning Hannaford's permit on the installation of a traffic signal at the intersection of Mechanicsville Road and Route 116.

¶ 60. At trial, Hannaford proposed several mitigation measures, with a focus on the Route 116/Commerce Street intersection because Commerce Street would provide primary access to the proposed project. Hannaford's proposed mitigation measures included increasing from 75 feet to 185 feet the length of the Route 116 southbound left-turn lane at Commerce Street; extending by 190 feet the westbound right-turn lane on Commerce Street; increasing the Route 116 north/south green signal time at the Route 116/Charlotte Road intersection; installing sidewalks along Commerce Street to the intersection with Route 116 and within the project area to allow pedestrian access from Mechanicsville Road and Commerce Street; and restricting the time of and entry route for truck deliveries.

¶ 61. Hannaford also offered to pay $25,000 as its contribution to the traffic-signal mitigation at the Route 116/Mechanicsville intersection. That sum represented the percentage of the estimated cost of a signal attributable to the project's expected nine-percent increase in peak-hour

26

traffic at the intersection. The court asked Hannaford's expert what that meant in the absence of any specific proposal to address further adverse impacts at the intersection, and the expert explained that the funds would be available should the Town or the State decide to install a signal at that intersection. When asked whether the traffic signal at that intersection was necessary, the expert observed that "the warrants for the signal at that location have been met for many, many years," but the Town and the State have not pursued installing one.

¶ 62.    Neighbors' expert testified that Hannaford's proposed mitigation did not adequately address the Route 116/Mechanicsville Road intersection and that the post-build status of the intersection as an LOS F was unacceptable. The expert testified that it was incumbent upon Hannaford, as well as required in the VTrans Traffic Impact Study Guidelines, to study and propose the mitigation needed to remedy an LOS of F that would result from the project, including studying the costs to implement the mitigation measures. The expert testified that Hannaford had not done this. He opined, "A potential mitigation will consist of signalizing the Mechanicsville Road intersection and coordinating it with the Commerce St. and Charlotte Road intersections," and indicated that the signal would need to be operational when Hannaford opens. Asked whether there was any downside to including a traffic light at that intersection, the expert said he could not think of any.

¶ 63.    In its decision, the court found all of the mitigation measures proposed by Hannaford to be necessary but not sufficient for Act 250 approval. With respect to the Route 116/Mechanicsville Road intersection, the trial court concluded that although the proposed project was not the sole cause of traffic issues at the intersection, "a traffic signal is necessary before the Project is operational to prevent further degradation of unacceptable traffic conditions." In addition to addressing the added traffic congestion associated with the project, the court concluded that the mitigation measures, including installation of a traffic light at the Route 116/Mechanicsville Road intersection, would satisfy the safety concerns in Criterion 5. Specifically, the court stated that

27

installing a signal at the intersection "and coordinating it with the signals to the north and south will achieve a smoother and more consistent flow of traffic" and "coordinating the traffic lights will improve congestion and reduce the need and opportunity for risky behavior often accompanying long delays and frustrated drivers."

¶ 64.    With respect to the payment for the required traffic signal, the court noted recent legislation empowering an Act 250 District Commission or VTrans (and therefore the Environmental Division when considering an appeal) to assess a transportation impact fee to fund capital improvements necessary to mitigate transportation impacts of proposed developments.  See 10 V.S.A. §§ 6101-6111.[7]   The court noted that neither VTrans nor the NRB had enacted rules implementing this statute and that the parties did not address the legislation at trial.  Accordingly, the court ordered generally that Hannaford pay its proportional share of this mitigating measure, but left it to the parties to work through the financing details.

¶ 65.    Various parties filed motions to alter or amend the judgment concerning the traffic issues.  The Town asked the court to recognize that VTrans controls whether changes to Route 116 are made and to require Hannaford to pay the full cost of any mitigation measures at the Route 116/Mechanicsville Road intersection.  Neighbors also requested that Hannaford be required to bear the full cost of the required traffic signal.  For its part, Hannaford asked the court to confirm that it need only escrow its proportional share of the cost of any required signal at the intersection and to

---

[7]   This legislation, enacted pursuant to 2013, No. 145 (Adj. Sess.), § 2, authorizes the assessment of a proportional transportation impact fee on proposed developments subject to Act 250.  The purpose of the legislation "is to provide a mechanism to allocate the costs to mitigate the impacts of land use projects to the transportation system in a manner that is equitable and that supports the planning goals of 24 V.S.A. § 4302." 10 V.S.A. § 6101.  Among other things, § 4302 encourages economic growth in locally designated growth areas, 24 V.S.A. § 4302(c)(1)(B).  In its findings accompanying the statute, the Legislature indicated that the mechanism provided is intended to be an alternative to the "last-one-in" approach that tended to require applicants to bear the entire burden of installing mitigation measures benefiting not only the proposed project but also existing and future projects.  2013, No. 145 (Adj. Sess.), § 1(b)(1).  Whether this 2013 legislation, with an effective date of July 1, 2014, applies to the March 2013 permit application at issue in this case was and is disputed.

allow the project to go forward if the Town and VTrans decided not to install a signal at the intersection. In the course of the briefing on these issues, the Town noted that its "enthusiasm for a traffic signal at the Mechanicville Road intersection is questionable" and that the Town "suspects that other parties are similarly unenthused." The NRB was more explicit, asserting that VTrans had informed the NRB that it had no projects in its capital program for the intersection in question and would not participate financially in any upgrades required by the Court.

¶ 66.    In response to those motions, the trial court noted "uncontradicted evidence that the Mechanicsville Road and Route 116 intersection experiences significant delays and congestion and that the additional traffic from the Project will exacerbate those unacceptable conditions." The court concluded that because a traffic signal was the only proposed mitigation for addressing the conditions at that intersection, the "signal must be installed and coordinated before the Project may be completed." The court expressed frustration that the only proposed mitigation for the Route 116/Mechanicsville Road intersection offered at trial was a traffic light, yet no party could point to evidence in the record that the Town and VTrans would not support a traffic signal. The court declined to alter its decision.

¶ 67.    Hannaford argues in its cross-appeal to this Court that the trial court exceeded its authority by purporting to require the Town and VTrans to install and fund a traffic signal at the Route 116/Mechanicsville Road intersection even though neither governmental entity had agreed to such a signal. In Hannaford's view, considering that neither the Town nor VTrans has any plans for a signal at the intersection despite the intersection's LOS F rating, the condition requiring the installation of a signal before the proposed project becomes operational amounts to a "functional veto" of the project, in violation of 10 V.S.A. § 6087(b). Hannaford requests that this Court modify the trial court's traffic-signal condition to require Hannaford to escrow $25,000 before commencing construction, with the escrowed funds being available for five years after the project begins operation

to contribute to the cost of any required traffic congestion improvements at the Route 116/Mechanicsville intersection.

¶ 68.     The Town joins Hannaford in opposing the trial court's condition that a traffic signal be installed at the Route 116/Mechanicsville intersection before the proposed project becomes operational, stating that it "lacks enthusiasm" for a signal at the intersection.  Like Hannaford, the Town argues that the condition effectively denies the project based on Criterion 5, in violation of 10 V.S.A. § 6087(b), because neither Hannaford nor the Town can install a traffic signal without the participation of VTrans, which is statutorily authorized to "[e]rect and maintain appropriate traffic control devices on state highways," 19 V.S.A. § 10(7), but was not a party in the Environmental Division proceeding.    The Town notes that, under VTrans' Traffic Impact Study Guidelines, if "installation of signals is proposed, a signal warrant analysis should be performed," and "[i]f a signal is warranted, an assessment of the need for and design of pedestrian phases should be included." Vermont Agency of Transportation, Traffic Impact Study Guidelines at 23 (Oct. 2008), available at http://vtrans.vermont.gov/sites/aot/files/planning/documents/trafficresearch/VTransTISguidelines Oct2008.pdf (Dec. 8, 2016) [https://perma.cc/S57A-E6EA].  The guidelines further state that "if a traffic signal is found to be warranted at any intersection analyzed, . . . and the developer proposes to install a traffic signal, then [VTrans] strongly recommends that a roundabout also be analyzed for installation at the same locations."  Id. at 24; see 2002, No. 141 (Adj. Sess.), § 37 (finding that roundabouts have proven to be cost-efficient way of dealing with dangerous intersections and directing VTrans "to carefully examine and pursue the opportunities for construction of roundabouts at intersections determined to pose safety hazards for motorists").  Accordingly, the Town maintains that the traffic-signal condition should be struck and that Hannaford should be required to perform a signal warrant analysis and to consider alternative measures to mitigate the project's impact on traffic at the intersection.  In the alternative, the Town proposes that the matter could be remanded

to the District Commission, where VTrans was a party, with instructions that a signal warrant analysis for the intersection be performed.

¶ 69.    Both Neighbors and the NRB urge this Court to uphold the trial court's condition requiring installation of the traffic signal before the project becomes operational.  Neighbors argue that Hannaford failed to preserve in the proceedings below its objection to a condition requiring installation of a traffic signal at the Route 116/Mechanicsville intersection, that the condition is supported by the record, and that any difficulty in implementing the condition is not a basis for striking it.  The NRB argues that Hannaford failed to preserve its "functional veto" argument and that, even if the argument was preserved, the court acted well within its authority in imposing the condition because it is reasonable and supported by the evidence.  The NRB agrees with Hannaford and the Town that the trial court cannot order the Town or VTrans to pay for any portion of the traffic signal, regardless of whether they are a party, and thus argues that there is no basis to remand the matter to make VTrans a party before the Environmental Division.  According to the NRB, as long as Hannaford offers to pay the entire costs of the traffic signal up front, there is no reason to believe that either the Town or VTrans would prevent Hannaford from satisfying the traffic-signal condition.

¶ 70.    We conclude that the court's condition requiring the installation of a traffic signal at the Route 116/Mechanicsville Road intersection is not supported by the evidence.  We reach this conclusion for two main reasons, operating in concert: the testimony of Neighbors' expert does not support the traffic light requirement, and Neighbors did not offer sufficient evidence that the condition was reasonable in the sense that it was likely to be attainable.  If it is not, then the condition would operate as an insurmountable obstacle to the project, in violation of the Legislature's direction that Act 250 permits not be denied on the basis of Criterion 5.  10 V.S.A. § 6087(b).[8]

---

[8]  We are not persuaded by Neighbors' argument that Hannaford failed to preserve this point below.  We do not rest our decision on the claim that the condition at issue constituted a functional

31

¶ 71.    First, Neighbors' expert did not purport to have conducted the necessary analysis to support the requirement of a signal at the Route 116/Mechanicsville Road intersection.   In his prefiled direct testimony, Neighbors' expert opined that Hannaford had to do <u>something</u> to address the unacceptable delays the project would exacerbate at the Route 116/Mechanicsville Road intersection.   He emphasized that the congestion at the intersection would be unacceptable, and stated:

> [I]n my opinion it is incumbent upon [Hannaford], as well as required in the VTrans Traffic Study Guidelines, to propose and study the mitigation needed to remedy a LOS of F that would result from the applicant's project, including study of the costs to implement the mitigation measures.  [Hannaford] has not done this.

The expert identified signalizing the intersection as "a potential mitigation" and opined that the signal would need to be operational when Hannaford opens in order to mitigate the unacceptable congestion the project would cause.  His live testimony at the hearing focused largely on his critique of Hannaford's traffic expert's estimate of the increased traffic the project would generate.  He did opine at one point that a signal at the Mechanicsville Road intersection was "an appropriate solution."  But when asked directly whether, under current conditions, a traffic light was warranted, Neighbors' expert said, "I did not do a traffic light analysis at that location." He proceeded to explain why he thought a traffic light would improve traffic flow, and that he believed the additional traffic from the project would warrant a signal, coordinated with the other signals on Route 116.  He did not, however, offer any specific design or specifications, testify that he had analyzed the feasibility of coordinating the proposed light with the other lights in the corridor to achieve the predicted results, point to a signal warrant analysis supporting the installation of a light, identify any analysis

---

veto of the project; for the reasons set forth below, we conclude that there is insufficient evidence in the record to support or disprove Hannaford's suggestion that it will not be able to comply with the traffic light requirement due to VTrans's and the Town's opposition.

of alternatives such as a roundabout, or provide a quantitative assessment of the impact of a light in mitigating the congestion at the intersection and associated safety issues.

¶ 72. We do not understand Neighbors' expert to have offered a specific traffic signal proposal based on appropriate traffic light analysis and a consideration of the effectiveness and desirability of other alternatives. The trial court understandably took up the traffic light suggestion because, general as it was, it was the only mitigation specifically directed at the Route 116/Mechanicsville Road intersection that was offered by any party, and the court rightly concluded that the project would exacerbate already unacceptable congestion at that intersection. But we understand the expert testimony to support only the more modest assertions that: (1) in the face of the unacceptable congestion exacerbated by the project, Hannaford was required to propose and study the mitigation needed to remedy the congestion—in essence, to conduct a signal warrant analysis as described in the VTrans guidelines; and (2) a traffic signal is a potential mitigation measure at the intersection.

¶ 73. Second, Neighbors did not meet their burden of demonstrating that the traffic light condition was reasonable, in the sense that it was attainable. A traffic light at the intersection might be a great idea, but if VTrans (a non-party to the proceedings before the Environmental Division) and the Town oppose it, and the project therefore has little chance of ever being built, it cannot be deemed a reasonable mitigating measure that is a precondition to implementation of the permit. See 10 V.S.A. § 6087(b) (providing that permit may not be denied solely on basis of Criterion 5, but authorizing "reasonable conditions and requirements" to alleviate burdens on traffic congestion and safety). In fact, as Hannaford and the Town now argue, if VTrans and the Town oppose installation of a traffic light, and it accordingly does not happen, then the permit condition requiring a traffic light would be tantamount to a denial of the permit, in violation of the provision that a permit may not be denied solely on the basis of Criterion 5. See id. Neighbors bore the burden of establishing the reasonableness of their proposed condition. See Champlain Parkway Act 250 Permit, 2015 VT

105, ¶ 16 (explaining that opposing party's burden under § 6088(b) "includes the duty to demonstrate the availability of reasonable mitigating steps, including reasonable alternatives") (quotation omitted). In this case, the absence of record evidence as to the practical feasibility of the traffic light proposal in light of VTrans's and the Town's own positions on the subject operates to Neighbors' detriment.

¶ 74. We do not mean to suggest that parties proposing mitigating measures must proactively establish in every case that the relevant state agencies will support or cooperate in the implementation of their proposed conditions. But in this case, the proposed mitigating measure called for significant action by VTrans, which was not even a party or witness in the proceeding before the Environmental Division. There was no evidence that VTrans or the Town had initiated any steps toward installing a traffic signal at the intersection. Hannaford introduced into evidence a June 2014 corridor planning study prepared by an engineering consulting firm for the Chittenden County Regional Planning Commission. See 19 V.S.A. § 10i(b) (requiring VTrans to "develop transportation corridor studies as needed," identifying problems and ranking them "according to their criticality and severity"). In relevant part, the study identified priority short-, medium-, and long-term projects for the Route 116 corridor near the Hinesburg town center. The study did not include a traffic signal at the Route 116/Mechanicsville Road intersection, notwithstanding the evidence of existing unacceptable levels of congestion during peak hours. When asked by the court what would happen if the court made a signal a condition of approval but the Town continued not to want a signal at the intersection, Neighbors' expert responded, "I can't answer that question." In this case, the parties and court were on notice of the substantial possibility that VTrans would not support a traffic signal at that intersection. Insofar as Neighbors proffered the traffic light as a mitigating measure, the burden fell to Neighbors to demonstrate the feasibility of the project. They did not meet that burden in this case.

34

¶ 75. For the above reasons, we remand the matter for further proceedings concerning mitigation.[9] On remand, any party advocating a traffic signal at the Route 116/Mechanicsville Road intersection, or construction of a roundabout in the state highway, as reasonable mitigation should have the opportunity to join VTrans as a necessary party. Insofar as the proposed traffic signal impacts VTrans's statutory and regulatory duties regarding state highways, the agency's participation is a necessary precursor to any ruling requiring such a condition. See 19 V.S.A. § 10(7) (providing that VTrans shall "[e]rect and maintain appropriate traffic control devices on state highways"). On remand, the trial court may on the basis of the existing record require Hannaford to conduct a traffic signal study pursuant to VTrans guidelines, including consideration of alternatives such as a roundabout, or may reopen the evidence on mitigation as it sees fit.

## 2. Traffic Study

¶ 76. We remand the issues surrounding the trial court's elimination of a post-approval traffic study requirement focusing on the Route 116/Commerce Street intersection so that the trial court can consider the Town's arguments in the first instance.

¶ 77. At trial, Neighbors' traffic expert testified that the southbound left-turn lane on Route 116 at Commerce Street should be extended to 200 feet in length rather than 185 as proposed by Hannaford. The fifteen-foot differential was significant because the added length pursuant to the Neighbors' proposal would have required replacement of the culvert over Patrick Brook—a substantially more involved process. The trial court found that the 185-foot left-turn lane was adequate, and no widening of Route 116 beyond that proposed by Hannaford was necessary. The court noted, however, that because much of the evidence before the court was based upon predictive traffic models, there was no certainty that the 185-foot left turn lane would be sufficient to mitigate increased traffic from the project. The court therefore imposed a condition that, post-construction,

---

[9] Because we conclude that the record does not support the traffic light condition, we need not address the issues concerning Hannaford's responsibility for paying for the improvement.

35

Hannaford and the Town should conduct a post-development traffic study of the left-turn lane from Route 116 southbound onto Commerce Street "to confirm that the 185-foot lane length is adequate." The court explained that if the lane length proved inadequate, Hannaford should obtain a further amendment to the Act 250 permit for any necessary mitigation.

¶ 78.  Neighbors moved to amend this aspect of the court's order, arguing that, as framed, the condition deprived them of their statutory right to participate in the determination of whether the turn lane is adequate because they were not afforded a role in the post-development study and subsequent proceedings.  Neither Neighbors, nor any other party, sought wholesale elimination of the post-development traffic study requirement.

¶ 79.  In response, the court explained that there was compelling evidence that Hannaford's traffic mitigation measures for the Route 116/Commerce Street intersection adequately dealt with the projected traffic conditions, but it had initially included the post-development traffic study to accommodate Neighbors' concerns that the 185-foot left-turn lane was not long enough.  Upon further review, and in light of the participation concerns raised by Neighbors, the court struck the post-development traffic-study condition altogether.  The court reiterated its conclusion that the credible evidence establishes that the project satisfies Criterion 5 with the improvements proposed by Hannaford, and that no further traffic studies are necessary.

¶ 80.  On appeal, the Town argues that, without the traffic-study condition, it will be impossible to determine whether Hannaford's predictive traffic impact analysis accurately forecasts the level of traffic that will be generated by the proposed project and whether the project will cause unreasonable traffic congestion.  According to the Town, the court's factual findings do not support elimination of the condition.  The Town emphasizes that no party on appeal opposes the condition and that, throughout these proceedings, Hannaford itself agreed that a post-development traffic study is needed to ensure that no unreasonable congestion results from the project at the Route 116/Commerce Street intersection.  The Town proposes a condition similar to the one VTrans

36

suggested to the District Commission. The Town's proposed condition would require Hannaford to perform traffic monitoring studies of all intersections studied by Hannaford within six months to a year after the project is open to the public. The proposed condition would also allow the District Commission to reopen the docket and make further findings and conclusions regarding appropriate mitigation measures in the event that the results of the monitoring demonstrated more congestion or unsafe conditions than predicted in Hannaford's traffic-impact analysis. Further, the Town's proposed condition would require necessary mitigation measures if the post-development monitoring demonstrated that Hannaford's proposed 185-foot left-turn lane on Route 116 at Commerce Street was inadequate to handle the traffic impacts from the project.

¶ 81. We conclude that the trial court exceeded its discretion in striking the traffic-study condition concerning the southbound left-turn lane of the Route 116/Commerce Street intersection for two reasons. In striking the condition, the court relied on the same predictive-model evidence that led it to impose the condition in the first place, but failed to explain why the post-project monitoring was no longer necessary. Moreover, because all parties to the proceedings before the trial court had agreed to some form of the post-development study condition, and the trial court removed the condition on its own initiative in response to a motion to reconsider that did not suggest elimination of the condition, the Town's opportunity to present to the trial court its arguments in favor of keeping the study has been circumscribed. A second post-judgment motion would not have been practicable. See Fagnant v. Foss, 2013 VT 16A, ¶ 10, 194 Vt. 405, 82 A.3d 570 (holding that untimely successive post-judgment motion does not toll the running of the appeal period). At a minimum, on remand the Town must have an opportunity to present its arguments in favor of retaining the post-development traffic-study condition in some form.

¶ 82. We note, however, that the all-encompassing study proposed by the Town, which would allow the District Commission to reopen the docket depending on the results of the post-permit traffic study, would directly violate our recent decision in Treetop. In Treetop, the District

37

Commission imposed a permit condition that reserved its right to continue to review stormwater mitigation measures "and to evaluate and impose additional conditions as needed." 2016 VT 20, ¶ 6. The Commission indicated that it was retaining jurisdiction to ensure that the mitigation measures proposed by the applicant would be effective and in compliance with Act 250. We upheld the Environmental Division's rejection of the condition, stating that, by reserving continuing jurisdiction over the stormwater system, the Commission was effectively creating a mechanism for it "to continuously amend the permit as necessary to redress future Act 250 violations," which not only expropriated the NRB's enforcement authority but also prevented finality in the land-use permitting process. Treetop, 2016 VT 20, ¶ 14. We concluded that such an open-ended condition was "an invalid condition subsequent." Id.

¶ 83.   We emphasized, however, that:

> Permissible conditions include those with prospective application that are intended to alleviate adverse impacts that either are or would otherwise be caused or created by a project, or those necessary to ensure that the development is completed as approved, such as those requiring permittees to take specific action when triggered by certain events, incorporating a schedule of actions necessary for continued compliance with Act 250 criteria, and requiring future compliance related filings, including affidavits of compliance with respect to certain permit conditions.

Id. ¶ 12.

¶ 84.   Thus, our decision in Treetop does not preclude a condition requiring a permit applicant to perform a post-development study of traffic conditions to assure that specific, evidence-based performance standards are met. The Environmental Division must, in the first instance, determine based on sufficient evidence that particular permit conditions will likely satisfy the statutory requirements. Having so concluded, the court may require the permittee to take pre-determined specific actions as a result of the failure to meet the performance standards. Whether or not a permit includes such pre-determined follow-up actions, in the absence of a permit amendment, see Act 250 Rules, Rule 34, Code of Vermont Rules, 12 004 060, available at

38

https://www.lexisnexis.com/hottopics/codeofvermontrules, the permittee's failure to meet the performance standards outlined in the permit conditions becomes a matter for enforcement proceedings.

¶ 85.    On remand, we direct that the trial court in the first instance to consider the Town's objection to its elimination of the post-development traffic study relating to the Route 116/Commerce Street intersection.  The court shall take additional evidence and make further findings regarding the propriety of a post-development traffic study given the evidence before it. We caution, however, that any condition the court imposes on remand must be consistent with our holding in Treetop, as discussed above.

The Environmental Division's site-plan decisions and judgment entered on April 12, 2016 and July 7, 2016 are reversed.  The Environmental Division's Act 250 decisions and judgment entered on July 7, 2016 are affirmed in part and reversed in part, and the matter is remanded for further consideration consistent with this opinion.

FOR THE COURT:

_____

Associate Justice